**ELDON INDUSTRIES, INC., Plaintiff,**

v.

**RUBBERMAID, INCORPORATED, and Rubbermaid Commercial Products, Inc., Defendants.**

**No. 87 C 6476.**

United States District Court, N.D. Illinois, E.D.

March 28, 1990.

---

A. Sidney Katz, Donald L. Welsh, Robert B. Breisblatt, Welsh & Katz, Ltd., Chicago, Ill., for plaintiff.

Robert B. Jones, Timothy E. Levstik, Fitch, Even Tabin & Flannery, Chicago, Ill., Edward G. Greive, Renner, Kenner, Greive Bobak & Taylor, Akron, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

ROVNER, District Judge.

Plaintiff Eldon Industries, Inc. ("Eldon") is engaged in the business of designing, manufacturing and selling office accessories. Defendants Rubbermaid, Inc. and its subsidiary Rubbermaid Commercial Products, Inc. (collectively, "Rubbermaid") are also in the business of designing, manufacturing and selling office accessories. In this action, Eldon alleges that Rubbermaid is liable for trademark infringement and unfair competition in connection with Rubbermaid's manufacture and sale of various office supplies which are similar to office supplies manufactured and sold by Eldon. Rubbermaid has filed counterclaims which seek, among other relief, cancellation of trademarks registered by Eldon on the Supplemental Register and other relief. Pending before the Court are objections to the Magistrate's Reports and Recommendations concerning plaintiff's motion for a preliminary injunction and defendants' motion for partial summary judgment.[1]

### II. FACTS

This case centers around three lines of products produced by Eldon: the Stackable line of office trays (see Figure 1); the Add–A–File vertical sorters (see Figure 2); and the Image 1500 line of office trays (see Figure 3). Count I alleges that Rubbermaid's QuickStack trays (see Figure 4) infringe Eldon's trademark rights in the Stackable line in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114. Count II alleges that Rubbermaid's QuickSnap sorters (see Figure 5) infringe Eldon's trademark rights in the Add–A–File line in violation of § 32. Counts III and IV allege that production and sales of the QuickStack trays and QuickSnap sorters, respectively, constitute unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Counts V and VI allege that Rubbermaid's production and sales of the Form 1000 trays (see Figure 6), and the risers for stacking those trays, constitute unfair competition in violation of § 43(a).

Figure 1

1. The Magistrate prepared two versions of the Report and Recommendation on plaintiff's motion for a preliminary injunction. One version contains confidential information concerning market shares and sales, and has been filed under seal. The other version redacts the confidential information in the findings of fact, but does not alter the conclusions of law. The redacted version, entered July 5, 1989 ("Report I"), is attached to this opinion as Appendix A, and the page cites refer to the public version. The Report and Recommendation on defendant's motion for partial summary judgment, entered September 19, 1989 ("Report II"), is attached as Appendix B.

Figure 2

Figure 3

Figure 5

Figure 4

Figure 6

The Magistrate has provided 135 recommended findings of fact in her Report and Recommendation on Eldon's motion for a preliminary injunction. Those findings are extremely thorough and detailed. Although Eldon asserts that the Report "includes clearly erroneous and incomplete findings of fact," Eldon identifies very few specific findings of fact with which it takes issue. Those findings are relatively minor and will be addressed where necessary in the context of the Court's discussion of the legal issues. Other than any findings which are rejected in that discussion, the Court adopts the Magistrate's findings of fact.

## III. PARTIAL SUMMARY JUDGMENT

### A. Counts III and IV

Rubbermaid moved for summary judgment with respect to Counts III and IV, the unfair competition counts concerning the Stackable trays and the Add–A–File, on the ground that the trade dress of neither product had acquired a secondary meaning prior to the introduction of Rubbermaid's competing products. Rubbermaid argued both that Eldon had failed to establish secondary meaning and that by placing its mark on the Supplemental Register, Eldon conceded that its products had not attained secondary meaning.

The Magistrate rejected both of Rubbermaid's arguments and concluded that there is a triable issue of material fact with respect to secondary meaning. Rubbermaid has not objected to this portion of the Report and Recommendation. Accordingly, the Court adopts the Magistrate's recommendation with respect to Counts III and IV and denies Rubbermaid's motion for summary judgment on those counts.

### B. Counts I and II and Rubbermaid's Counterclaim

With respect to Counts I and II, the trademark infringement counts concerning the Stackable trays and the Add–A–File, Rubbermaid argued that Eldon's claims must fail because Eldon's trademarks are invalid. Specifically, Rubbermaid argued that Eldon had not satisfied the requirement of § 23 of the Lanham Act, 15 U.S.C. § 1091, that registration on the Supplemental Register is appropriate only if the mark was "in lawful use in commerce by the proprietor thereof, upon or in connection with any goods or services for the year preceding the filing of the application." For the same reason, Rubbermaid moved for summary judgment in its favor on its counterclaims for cancellation of Eldon's trademark registrations for these products.[2]

### 1. Retroactivity of Amendment

Before the merits of the Magistrate's Report may be reached, the Court must consider the retroactivity of an amendment to the Lanham Act which became effective during the pendency of Eldon's objections. In order to address this issue, the Court must review chronologically a portion of the Lanham Act's history.

The Lanham Act was originally passed in 1946. Section 46(a) of the Act, the enabling section, provided, in part: "This act shall be in force and take effect one year from its enactment, but except as otherwise herein specifically provided shall not affect any suit, proceeding, or appeal then pending...."[3]

In *Hygienic Product Co. v. Judson Dunaway Corp.* 81 F.Supp. 935, 947 (D.N.H. 1948), *rev'd on other grounds,* 178 F.2d 461 (1st Cir.1949), *cert. denied,* 339 U.S. 948, 70 S.Ct. 802, 94 L.Ed. 1362 (1950), the court gave effect to § 46(a) and denied a request to apply the Lanham Act to a lawsuit which had been filed on May 31, 1947, over one month before the effective date of the Lanham Act. *See also Magic Foam Sales Corp. v. Mystic Foam Corp.,* 167 F.2d 88, 90 (6th Cir.1948); *King Kup Candies, Inc. v. H.B. Reese Candy Co.,* 140 F.Supp. 115 (M.D.Pa.1956).

---

**2.** 15 U.S.C. § 1092 provides that "[i]f ... the registrant was not entitled to register the mark at the time of his application for registration thereof, ... the registration shall be canceled...."

**3.** 15 U.S.C. § 1051 note.

In 1975, § 35 of the Lanham Act, 15 U.S.C. § 1117, was amended to provide for recovery of attorneys' fees in exceptional cases. Section 4 of the Act which effected this amendment provided that the amendment did not affect any pending suit, proceeding or appeal.[4] In *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372 (D.Md.1976), the court held that the amendment to § 35 did not apply to a lawsuit which had been instituted in 1973.

In 1988, Congress passed the Trademark Law Revision Act of 1988, which is in issue here. Section 121 of the 1988 Act amended § 23 of the Lanham Act to eliminate the one year requirement, by deleting the bracketed material in the following passage:

> All marks capable of distinguishing applicant's goods or services and not registrable on the principal register ... which have been in lawful use in commerce by the proprietor thereof, upon or in connection with any goods or services [for the year preceding the filing of the application] may be registered on the supplemental register....

Section 136 of the 1988 Act provides: "This title and the amendments made by this title shall become effective on the date which is one year after the date of enactment of this Act."[5] The Act was enacted on November 16, 1988, and it became effective November 16, 1989.

The Magistrate found that Rubbermaid was entitled to summary judgment on Counts I and II of the complaint and on Rubbermaid's counterclaims because Eldon had not enjoyed exclusive use of the alleged trademark for the relevant one year period. This analysis necessarily rested on the one year provision which was dropped by the 1988 amendment.

█ The parties dispute whether the 1988 amendment applies to this pre-existing lawsuit. Eldon brought the amendment to the Court's attention by filing, with leave of Court, supplemental objections to the Magistrate's Report. Eldon primarily relies on the principle of *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), that "a Court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." Eldon states that in this case there is no such manifest injustice or statutory or legislative history forbidding retroactive application, and that the 1988 amendment should therefore govern.

Rubbermaid has responded by relying on § 46 of the Lanham Act, which provides that the act does not apply retroactively,[6] and by moving for sanctions pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927. Rubbermaid argues that pursuant to § 46, Lanham Act amendments do not apply to pending litigation. Rubbermaid cites *Five Platters, supra, King Kup, supra,* and *Hygienic Product, supra,* in support of this proposition.

Eldon replies by arguing that Rubbermaid's motion for sanctions is not well grounded and is itself sanctionable. Eldon further argues that § 46 applied only to the 1946 Act and does not apply to subsequent amendments. Rubbermaid counters that the 1988 Act re-enacted the 1946 Act, including § 46.

The Court agrees with the position advanced by Eldon. Section 46 of the 1946 Act was merely the enabling provision. It was not codified, and by its terms it refers only to the 1946 Act itself. With the exception of *Five Platters*, the cases relied on by Rubbermaid concern the application of the 1946 Act itself to pending litigation, and they are thus inapplicable to the present dispute concerning the 1988 amendment. In *Five Platters*, the court refused to apply to pending litigation an amendment which provided, by that amendment's own terms, that it was not to be applied to pending litigation. The 1988 amendment, in contrast to the 1975 amendment at issue in *Five Platters*, does not contain such a pro-

---

**4.** Pub.L. 93–600, 88 Stat.1955.

**5.** 15 U.S.C. § 1051 note.

**6.** *See supra* at pages 792–93.

vision. It does contain an effective date provision of its own, where a prohibition of retroactive application could have been inserted. As demonstrated by the 1975 amendment, Congress knew how to draft such a provision if it so intended.

Rubbermaid contends that the 1988 Act is unlike the 1975 Act because the 1975 Act amended only a minor portion of the Lanham Act whereas the 1988 Act dramatically restructured the entire Act. Rubbermaid argues that the 1988 Act "specifically incorporated" § 46 of the 1946 Act, but Rubbermaid offers no authority for this proposition. The 1988 Act describes itself as "An Act to *amend* the Act entitled 'An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes.'" It is not entitled "An Act to *re-enact*, etc." It contains no provision adopting, amending, or in any way referring to § 46 of the 1946 Act. On the contrary, it contains its own enabling section, § 136, which serves the same function as § 46 but omits any reference to pending litigation. The Court cannot agree that the 1988 Act re-enacted, rather than amended, the 1946 Act. Section 46 applies only to the 1946 Act itself. The Court can only conclude that the 1988 Act's silence, especially in light of Congress' demonstrated ability to prohibit retroactive application when it so desires, evinces an intent that the 1988 Act apply to pending litigation, in accord with the default principle of retroactive application as described in *Bradley.*

■ Because the Court finds that the one year provision, which was eliminated by the 1988 Act, does not apply to this case, the Court concludes that Rubbermaid's motion for summary judgment on its counterclaims and on Counts I and II of Eldon's complaint must be denied.[7]

### 2. Sanctions

In unpublished opinions, this Court has often expressed its dismay with the excessive amount of time that it has been forced to devote to motions for sanctions, which consume resources that could be expended more productively on the merits and which inevitably seem to invite cross-motions for sanctions. Although Fed.R.Civ.P. 11 has its place, and there are certainly cases where sanctions are warranted, motions for sanctions have often become simply another weapon in the arsenal of hardball litigators who wish to burden opponents and the judicial system with every accusation possible.

■ Although the requests for sanctions in this case are regrettable, ruling on them is a simple task given the Court's conclusion above that the amendment to the Lanham Act is retroactive. Because Eldon's position on retroactivity is correct, its supplemental objections did not violate Rule 11 or § 1927. Rubbermaid's motion for sanctions based on Eldon's supplemental objections must therefore be denied. Furthermore, because Eldon's supplemental objections were not only well-grounded but were actually correct on the merits, the Court

---

7. Before the parties briefed the retroactivity issue, the Court was prepared to adopt the Magistrate's Report and Recommendation on these counts. Eldon had argued that the Magistrate erred in her conclusion that "lawful use" means "exclusive use" rather than "substantially exclusive use," at least in the circumstances involved here. The Court believes that "exclusive use," rather than "substantially exclusive use," was the proper inquiry before the 1988 Act. All of the applicable authority supports such a reading. *See, e.g., Loctite Corp. v. National Starch & Chemical Corp.,* 516 F.Supp. 190, 212 (S.D.N.Y. 1981); *Ajax Hardware Corp. v. Packaging Techniques, Inc.,* 182 U.S.P.Q. 559, 561 (C.D.Cal. 1974); *Kwik–Kopy Franchise Corp. v. Dimensional Lithographers, Inc.,* 173 U.S.P.Q. 378, 381 (T.T.A.B.1972). Some cases had referred to a

"substantially exclusive use" standard, but only in the context of finding that even if it were the appropriate standard, it had not been satisfied on the facts. *See Loctite,* 516 F.Supp. at 212–13; *Ajax Hardware,* 182 U.S.P.Q. at 561. They did not adopt a "substantially exclusive use" standard. *See, e.g., Ajax Hardware,* 182 U.S.P.Q. at 561 ("the Court of Customs and Patent Appeals has consistently construed lawful use to mean exclusive use. The court finds that plaintiff has failed to justify a departure from the statutory construction of Section 23 announced by the Court of Customs and Patent Appeals."). Furthermore, the various policy arguments advanced by Eldon do not require a contrary conclusion—they are matters which are more appropriately addressed by Congress, which apparently has taken heed of them.

believes it has no choice but to conclude that Rubbermaid's motion for sanctions itself violated Rule 11. A motion for sanctions can hardly be well grounded where it challenges arguments which the Court upholds.

However, Eldon cannot have incurred substantial attorneys' fees and costs in responding to the motion for sanctions, because Eldon needed do no more in response than it was already doing to file its reply memorandum on the merits of the retroactivity issue. Accordingly, the Court will impose on Rubbermaid nominal sanctions of $200 payable to Eldon.

## IV. MOTION FOR PRELIMINARY INJUNCTION

Eldon moved for a preliminary injunction to enjoin the manufacture, advertisement and sale of Rubbermaid's competing products on the ground that Rubbermaid's products infringed on the trade dress used in Eldon's products. In determining whether a preliminary injunction is warranted, the Court must consider:

> (1) whether the plaintiff has an adequate remedy at law; (2) whether the plaintiff will suffer irreparable harm if the injunction is not granted and whether this harm is greater than any irreparable harm to defendant if the injunction is granted; (3) whether the plaintiff has some likelihood of success on the merits and how likely that success is "because this affects the balance of harms" between the parties; and (4) the consequences of an order granting or denying a motion for preliminary injunction on the public interest.

*Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1181 (7th Cir.1989). The Magistrate concluded Eldon had not shown that any of these factors supported its position and that a preliminary injunction should therefore not enter.

### A. *Likelihood of Success*

■ The most significant part of the Magistrate's analysis was her consideration of the likelihood of success on the merits. As the Magistrate noted (Report I at 40), the tests for prevailing on the infringement claims and the unfair competition claims are essentially the same. Eldon must establish either that its trade dress has acquired secondary meaning or that its trade dress is a distinctive, identifying mark. Eldon must also establish that consumers are likely to be confused as to the source of the product because of the products' similar appearances. Finally, Eldon cannot prevail if the trade dress is determined to be functional. *See Schwinn,* 870 F.2d at 1182–83 (reversing grant of a preliminary injunction in unfair competition case). *See also Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 935 (7th Cir.1989). In this case, there is no contention that the trade dress is a distinctive, identifying mark. Accordingly, a finding of infringement initially turns on a determination that Eldon's trade dress has acquired secondary meaning and that there is a likelihood of consumer confusion.[8]

### 1. *Stackable and Add–A–File*

■ *a. Secondary Meaning.* Whether a trade dress has acquired a secondary meaning is a question of fact. *Vaughan Mfg. Co. v. Brikam International, Inc.,* 814 F.2d 346, 349 (7th Cir.1987). As the Magistrate noted (Report I at 43), a number of factors must be weighed in determining whether a trade dress has acquired secondary meaning. In Eldon's favor, the Magistrate found that Eldon dominated the market; that it spent considerable funds on advertising and promotion; that it enjoyed substantial revenues; that it had a long period of exclusive use (due to a patent which has since expired); and that Rubbermaid intentionally copied Eldon's products. In favor of Rubbermaid, the Magistrate found that the design was a simple geometric pattern; that there was little evidence (e.g., survey evidence) that consumers actually associated this pattern with a single source; that the advertising did not specifically emphasize the ribbed pattern; and

---

**8.** The Magistrate rejected Rubbermaid's argument that the trade dress at issue is functional.

Rubbermaid has not objected to that finding.

that there was no evidence that Rubbermaid's intent was to confuse consumers. The Magistrate concluded that Eldon had presented sufficient evidence of secondary meaning to create a triable issue of fact, but not enough to show a likelihood of success.

Eldon raises a number of objections to the Magistrate's analysis of the secondary meaning issue. First, Eldon argues that the Magistrate placed insufficient emphasis on the fact that Rubbermaid intentionally copied elements of Eldon's trade dress. However, although such evidence is probative, it is not conclusive. *Vaughan*, 814 F.2d at 349; *Keystone Camera Products Corp. v. Ansco Photo–Optical Products Corp.*, 667 F.Supp. 1221, 1231 (N.D.Ill. 1987). The Magistrate found that Rubbermaid had intentionally copied elements of Eldon's design, but not with the intent to confuse consumers. (Report I at 47.) She properly considered these findings as factors in her overall analysis.

Eldon further objects that the Magistrate placed excessive emphasis on the lack of any survey evidence indicating actual consumer confusion. As Eldon correctly states, such survey evidence is not required in order to demonstrate secondary meaning. *Vaughan*, 814 F.2d at 349; *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 908 (7th Cir.1986). The Magistrate, however, recognized this principle. She did not treat the absence of such evidence as conclusive, but rather considered it as part of her analysis. (Report at 46.)

Most importantly, Eldon objects that the Magistrate improperly considered the factors in isolation rather than weighing them in their totality, or that she erroneously assumed that every factor must be present in order to establish secondary meaning. On the contrary, it is Eldon, not the Magistrate, which urges an overly simplistic approach toward the secondary meaning. Rather than merely taking each factor in isolation, deciding which party "won" on that factor, and then deciding in favor of the party that won on the most factors, the Magistrate considered all of the factors together in reaching her conclu-

sion. The Court finds it unnecessary to review here all of the Magistrate's analysis. The Magistrate found, after considering the evidence as a whole, that Eldon had not demonstrated that it was likely to prove secondary meaning, and the Court agrees with and adopts both the Magistrate's reasoning and her conclusion.

*b. Likelihood of Confusion.* With respect to the likelihood of consumer confusion, again a number of factors must be weighed. *See Roulo*, 886 F.2d at 937; *Schwinn*, 870 F.2d at 1185. The Magistrate found that some factors favored Eldon and other factors favored Rubbermaid. In favor of Eldon, she found that the advertising media employed are similar, that the distribution channels are similar, that the products are similar, that the trade dresses are similar, and that Rubbermaid intended to copy Eldon's design. In favor of Rubbermaid, she found that the trade dress is not distinctive and that there is little evidence of actual confusion. She also emphasized that the Eldon and Rubbermaid logos are prominently displayed in the catalogues from which most sales are made and that the products' packages also are clearly labelled with the companies' logos. She found that there was no possibility of consumer confusion at the time of the sale. She did find that there was some chance of confusion after the sale, but that even this possibility was minimized because the companies' names are molded into the bottoms of the products and because there are subtle differences between the products which are visible upon close inspection.

Eldon's objections with respect to the likelihood of confusion are similar to the objections described above with respect to secondary meaning. Eldon argues that the Magistrate overemphasized the lack of any evidence of actual confusion and emphasizes that such evidence is not required in order to show a likelihood of confusion. *See Schwinn*, 870 F.2d at 1187. However, the Magistrate did not treat the lack of such evidence as conclusive in itself. She gave it appropriate weight along with the other evidence. In her summary of the

evidence which she viewed as particularly significant, she did not even mention it, emphasizing instead that most sales of both products occurred through office products catalogs, that the names and logos of the manufacturers are clearly displayed alongside the products in those catalogs, and that both companies' products are clearly labelled with large, distinctive labels. (Report I at 53.)

Eldon also contends that the Magistrate erred in finding that the trade dress is not distinctive. Eldon oversimplifies the Magistrate's finding by saying that she found the trade dress not distinctive merely because it employs common geometric shapes. The Magistrate stated that not only are the elements of the trade dress common, but that nothing about "any one of them or their overall configuration suggests that the design functions as a trademark." (Report I at 50.) The Court agrees that the design, although it does "appear to combine common, simple elements in a very pleasing form" (Report at 50), is not particularly distinctive.

▆▆▆ As with the secondary meaning issue, Eldon argues that the Magistrate failed to consider the various factors in their totality. However, the fact that a greater number of factors may have pointed in Eldon's favor is not determinative:

> The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other.

*Schwinn*, 870 F.2d at 1187. Thus the importance of each factor depends on the circumstances of each case. Here, the Magistrate properly weighed all of the evidence and factors as a whole in determining that Eldon had not demonstrated a likelihood of confusion. The Court agrees with that conclusion and adopts the Magistrate's reasoning.

#### 2. Image 1500

The Magistrate found that the evidence of secondary meaning with respect to Eldon's Image 1500 line was considerably weaker than the evidence relating to the Stackable and Add–A–File lines, and she did not reach the issue of likelihood of confusion. She found that the Image 1500 line is somewhat distinct from competitors because of its grace and elegance, but that the basic elements of its design had been used previously by a number of other manufacturers. She found no evidence that consumers view the design as a source identifier or that the design is sufficiently distinct to support a secondary meaning. (Report I at 61–62.)

▆▆▆ Eldon objects that the Magistrate did not address the stacking supports, as opposed to the trays themselves, and that the Magistrate placed insufficient emphasis on the distinctive attractiveness of the design of the Image 1500 line. The first objection is a minor point which would not alter the Magistrate's analysis. The second objection is similarly without merit; the Magistrate stated that it was not enough that the Eldon product be more attractive than similar competing products, and the Court agrees. The Court adopts the Magistrate's reasoning and her conclusion that Eldon has not demonstrated a likelihood of success with respect to the Image 1500 line.

### B. Irreparable Harm

▆▆▆ Eldon argues that the Magistrate erred in concluding that it has not demonstrated that it will suffer an irreparable injury in the absence of a preliminary injunction. Eldon primarily contends that the Magistrate, although giving it pro forma recognition, failed to apply the presumption of irreparable harm that exists in trademark infringement cases. *See Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir.1982). On the contrary, the Magistrate specifically found that she would have "no difficulty concluding that to the extent consumers are confused, Eldon faces irreparable injury if Rubbermaid is not enjoined." (Report I at 63.) The Magistrate based her determination that irreparable injury had not been demonstrated primarily on her conclusions concerning the likelihood of success

on the merits, along with the fact that Eldon had delayed for several years before filing the lawsuit. Although Eldon does have justifications for those delays (Report I at 63–64), the delays nonetheless tend to undercut Eldon's position that it will be irreparably injured. The Court agrees with the Magistrate's analysis of irreparable injury.

### C. Balance of Harms

The Magistrate concluded that Eldon did not establish that the balance of harms is in its favor. Eldon objects to this conclusion, emphasizing that Rubbermaid is a large company, that the products represent only a small part of Rubbermaid's business, that all of Rubbermaid's sales are sales which Eldon has lost, that Rubbermaid's market shares are increasing, and that any injury suffered by Rubbermaid is caused only by its own intentional infringement of Eldon's trademarks. The Magistrate's thorough analysis of the balance of harms adequately addresses these concerns. The Court adopts the Magistrate's reasoning and conclusion on this issue.

### D. Public Interest

 Eldon argues that the public interest "demands" injunctive relief in this case. The Magistrate found that although a preliminary injunction would ensure that consumers are not confused, the public interest does not require an injunction in light of the minimal likelihood of such confusion in the first place. (Report I at 75.) The Court agrees with this conclusion.

### V. CONCLUSION

 The Magistrate's Report and Recommendation on defendants' motion for partial summary judgment is adopted with respect to Counts III and IV of Eldon's complaint. It is not adopted with respect to Counts I and II of Eldon's complaint and Rubbermaid's counterclaims because of the intervening amendment to the Lanham Act. Rubbermaid's motion for partial summary judgment is denied in all respects.

With respect to Eldon's motion for a preliminary injunction, the Magistrate's Report and Recommendation is adopted in all respects. Eldon's motion for a preliminary injunction is denied.

### APPENDIX A

### REPORT AND RECOMMENDATION RESPECTING ELDON'S MOTION FOR THE ENTRY OF A PRELIMINARY INJUNCTION

TO THE HONORABLE ILANA DIAMOND ROVNER, one of the Judges of the United States District Court for the Northern District of Illinois.

This matter is before the court on the motion of plaintiff, Eldon Industries, Inc. ("Eldon") for a preliminary injunction to enjoin the manufacture, advertisement and sale of eight of defendant Rubbermaid, Inc.'s and defendant Rubbermaid Commercial Products, Inc.'s (referred to collectively as "Rubbermaid" except where otherwise indicated) office accessories which allegedly infringe upon and are confusingly similar to the trade dress of eight of plaintiff's products. The Eldon products, and the allegedly infringing Rubbermaid products, are set out on the chart which follows:

### THE ELDON PRODUCTS IN ISSUE AND THE COMPARABLE, ALLEGEDLY INFRINGING RUBBERMAID PRODUCTS [1]

| | ELDON | | RUBBERMAID | |
| --- | --- | --- | --- | --- |
| | Product Identification Number | Product | Product Identification Number | Product |
| (1) | 1600 | Letter Size "Stackable" Tray | 2551 | Letter Size "QuickStack" Filing Tray |
| (2) | 1602 | Legal Size "Stackable" Tray | 2552 | Legal Size "QuickStack" Filing Tray |
| (3) | 1604 | EDP Size "Stackable" Tray | 2553 | EDP Size "QuickStack" Filing |

ELDON | | RUBBERMAID

| | Product Identification Number | Product | Product Identification Number | Product |
|---|---|---|---|---|
| (4) | 1607 | Front Loading Letter Size "Stackable" Tray | 2554 | Front Loading Letter Size "QuickStack" Filing Tray |
| (5) | 1601 | "Add–A–File" Vertical Filing System | 2555 | "QuickSnap" Vertical Filing System |
| (6) | 1570 | "Image 1500" Letter Tray | 2131 | "Form 1000" Letter Size Tray |
| (7) | 1579 | "Image 1500" Legal Letter Tray | 2130 | "Form 1000" Legal Size Tray |
| (8) | 1539 | "Image 1500" Stacking Support | 2132 | "Form 1000" Riser |

[1] The following additional Rubbermaid products, not in issue, are referred to frequently in this report: 2521 SnapStack Letter Tray; 2522 SnapStack Legal Tray; 2511 Designer II Letter Tray; 2510 Designer I Legal Tray; 2508 Designer II Snap File; 2111 Classic Form 1000 Letter Tray; 2110 Classic Form 1000 Legal Tray; and 2112 Classic Form 1000 riser.

In its six-count complaint Eldon alleges that the eight office accessories of defendants listed above are confusingly similar to Eldon products, and that defendants' manufacturing, advertising and sale of these products constitute trademark infringement in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),[2] and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[3] Both defendants have denied the substantive allegations of the complaint and have asserted affirmative defenses. In addition, Rubbermaid Commercial has filed a ten-count counterclaim against Eldon, seeking, among other things, cancellation of Eldon's Trademark Supplemental Register Nos. 1,403,588 and 1,403,589, several declaratory judgments, and injunctive relief.

**2.** Under § 32(1), a corporation cannot:
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

**3.** Section 43(a) provides in pertinent part:

Following a four-day hearing, the parties submitted briefs and proposed findings of fact. Having reviewed the transcripts, briefs, exhibits, and proposed findings of fact, this court recommends that the district court adopt the proposed findings of fact and conclusions of law set forth below.

## RECOMMENDED FINDINGS OF FACT

### The Parties and Jurisdiction

1. Plaintiff Eldon is a Delaware corporation with its principal place of business in Inglewood, California. Its business includes the design, manufacture and sale of office accessories. (Complaint at 1–2, ¶ 3.) Robert Silverstein is Eldon's president and chairman of its board of directors (Tr. 29; PX Eldon 9 at 2). Herbert Rome, a mem-

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

ber of Eldon's board of directors, is its executive vice-president (Tr. 20). Glen Church is the president of Eldon's Office Products Division (Tr. 169).

2. Defendant Rubbermaid, Inc. is an Ohio corporation with its principal place of business in Wooster, Ohio. Its business includes the manufacture of rubber and plastic products, including office accessories. (Answer and Affirmative Defenses of Defendant Rubbermaid, Inc. at 2, ¶ 4.) Stanley C. Gault ("Gault") is the chairman of Rubbermaid's board of directors (PX Eldon 11).

3. Defendant Rubbermaid Commercial, one of various subsidiaries of Rubbermaid, Inc., is a Delaware corporation with its principal place of business in Winchester, Virginia. Its business includes the design, manufacture and sale of office accessories (Answer, Affirmative Defenses and Counterclaims of Defendant Rubbermaid Commercial at 2, ¶ 4; *id.* at 12, ¶ 1). Robert Snyder was its president in October 1985 (Tr. 83). The Office Products Group, the division that manufactures the products at issue, is part of Rubbermaid Commercial (Tr. 619).

4. This lawsuit was filed on July 22, 1987. The court has jurisdiction of this action based on 15 U.S.C. § 1121 and 28 U.S.C. § 1338. Eldon moved for a preliminary injunction on February 4, 1988.

*Eldon's Entry Into the Office Products Marketplace*

5. In 1961, Eldon was primarily engaged in the business of manufacturing and marketing plastic toys. It began to design office accessories in 1965. Its first line of office accessories was the 1300 line. Eldon used an outside designer to design the line's first accessory, the 1370 Letter Tray, and the remainder of the line was designed by Eldon employees (Tr. 25–27, 30). This product is still advertised and sold in the marketplace (Tr. 30; PX Eldon 2 at 6; PX C–6 at 193). Robert Silverstein had authority for the final approval of the design of the 1370 Letter Tray (Tr. 28–29). Herbert Rome, Eldon's executive vice-president, had the final approval of the design

of all products developed after the 1370 Letter Tray (Tr. 28).

6. Eldon's 1300 line of office accessories had solid plastic sides with wood trim (Tr. 33).

7. In the late 1960's, Eldon began to develop its 1600 "Stackable" Tray line because of a perceived need for a horizontal sorting system in which trays could be added or removed (a "modular" system) (Tr. 31). Eldon used an outside design firm, E.J.M., to develop the design of this line. Frederick Gordon MacKay ("MacKay") was the E.J.M. principal most closely involved with Eldon in this venture (Tr. 33).

8. The first stackable letter tray manufactured by Eldon was its 1600 Letter Size Stackable Tray. It is a side-loading tray. It contains a vertical rib design extending across approximately two-thirds of the width of the tray's two side walls; each side wall also contains a rectangular handhole (PX Stackable 1). The ribbed design of the tray consists of vertical plastic strips separated by spaces. This type of design is created by a process called "coring" (Tr. 481–482). The floor of the tray, which does not contain ribs, holds paper (Tr. 131; PX Stackable 1). The 1600 Letter Size Stackable Tray was first sold in approximately 1968, and is currently advertised and sold in the marketplace (Tr. 34; PX Eldon 2 at 10).

9. Eldon offered evidence that it chose a cored rib design because of its attractiveness, the visual accessibility of documents it offered and the decrease in material required (Tr. 35; Dep. of MacKay at 20, 26). While the use of a ribbed design created through the coring process reduces the amount of material needed to produce the accessory compared to a solid wall design, it does not necessarily reduce the costs of production (Tr. 137–138).

10. No one has ever told Rome that he or she bought the tray specifically because of the ribs (Tr. 147). The text of the Eldon catalogue advertisements does not mention the cored rib design. The design is visible in the catalogue pictures but is not singled out for emphasis. Eldon has never advertised that the cored rib configuration of the

tray is trademarked and has never used the design as a logo (Tr. 149; PX C–5–C–12).

11. Eldon applied for and received design patent No. 220,014 on the design configuration of its Stackable Tray. The patent was effective February 23, 1971, and was valid for 14 years. Herbert Rome and Erland Paulson were listed as co-inventors; Gordon MacKay was not (Tr. 44, 192; DX 31).

12. Sometime in the early 1970's, Eldon incorporated the cored rib configuration on a new product, the 1604 Super Stackable Tray, which permits sorting and storage of EDP size (data processing) papers and binders. It is a side-loading accessory with hand-holes (Tr. 37; PX Stackable 3; PX Eldon 2 at 10).

13. Sometime in the late 1970's, Eldon produced the side-loading 1602 Legal Size Stackable Tray; it also incorporates the cored rib design and hand-holes (Tr. 38; PX Stackable 2; PX Eldon 2 at 10). At about the same time, Eldon produced another letter tray with a cored rib design and hand-holes, the 1607 Front–Loading Stackable Tray (Tr. 38; PX Stackable 4; PX Eldon 2 at 10).

14. Eldon's use of the cored rib configuration continued into the 1980's. In this period, Eldon manufactured a side-loading printer stand utilizing the design (Tr. 38; PX Stackable 5; PX Eldon 2 at 20). Eldon also produced the 1613 Mobile Printer Cart, a side-loading accessory featuring seven trays. This accessory utilizes the ribbed design, and each side wall contains a hand-hole (PX Stackable 6; PX Eldon 2 at 20). Eldon also manufactured the 1603 Note Rack utilizing the ribbed design (PX Stackable 9; PX Eldon 2 at 14).

15. From approximately 1970–1973, Mel Evenson was employed by Mitchell Bobrick, Incorporated ("Bobrick"). While Evenson was employed at Bobrick, Eldon was a Bobrick client. While a Bobrick employee, Evenson designed the Eldon "Hot File." The Hot File mounts on the wall and functions as a receptacle for papers. Evenson did not utilize a ribbed design on this product. He testified that he believed ribs were inappropriate for a product designed to hang on a wall (Tr. 213–214, 259). Sterling Plastics ("Sterling"), at a time not disclosed in this record, manufactured and offered for sale a similar accessory. The Sterling product features a prominent ribbed design, although the ribs are embossed, rather than cored (Tr. 260; DX 6). Evenson at some time saw Sterling's product at an office product show. At that time, a person whose identity he cannot recall asked Evenson why he had not put ribs on the Eldon Hot File since Eldon was the company that featured ribs on their products. Evenson explained that he thought that ribs did not belong on a product hung on a wall (Tr. 283–284, 290). Sterling currently sells two plastic wall pockets that use a cored rib design similar to that of the Eldon Stackable—the Handi–Mate and the Handi–Mate Add-on (PX C–8 at 98).

16. Evenson began to work at Eldon in 1973. His first position was manager of the New Products Development division. Today, he is the vice-president of that division (Tr. 214–215). He has designed various products for Eldon besides those at issue in this lawsuit (Tr. 217–226; PX Eldon 2 at 4–5, 7–8).

17. Sometime prior to 1979, Evenson developed a vertical sorter which featured the ribbed design, the 1655 Vertical Sorter, designed to fit on top of the 1600 Letter Size Stackable tray. While ribs were used in the sorter, the coring process was not utilized; the side walls are solid plastic with an embossed rib design. The sorter contains five compartments created by four dividers which can be adjusted to create different sized compartments to meet the user's needs. The sorter is sold by itself as well as with the 1600 tray (Tr. 40–41, 224–225; PX Stackable 7; PX Eldon 2 at 13; PX C–5 at 267). The 1656 Vertical Sorter, also an Eldon product, is identical to the 1655 Vertical Sorter except that it contains six compartments and five dividers (PX Stackable 8; PX Eldon 2 at 13; PX C–5 at 267). These products were introduced in 1979 (DX 40).

18. Eldon also utilized the ribbed design of the Stackables in its 1601 Add–A–File, a modular vertical sorting system. Herbert

Rome created the Add–A–File concept. Rome, Paulsen, and other Eldon employees were involved in the design of the product (Tr. 56). The cored rib design transverses the entire face of the product. The plastic rib in the center of the wall is thicker than the other ribs. Two or more Add–A–Files can be used as interlocking units to create any size vertical file. Add–A–Files are currently available in 18 colors (Tr. 290; PX Add–A–File; PX Eldon 2 at 13). The material of which an Add–A–File is composed depends upon its color. In 1984, the "smoke" version was made of general purpose styrene, with other colors composed of medium impact styrene (PX QuickSnap 9).

19. Eldon applied for and received design patent No. 220,633 on the design configuration of the Add–A–File. It was valid May 4, 1971 through May 4, 1985. The wide center rib on the Add–A–File is clearly visible in the drawings attached to the patent application (DX 32).

20. Other Eldon products included two lines of stacking trays which required separate support mechanisms, the 1300 Series and the 1400 Series. Neither of these lines utilized a ribbed design. Eldon designed its Image 1500 line to replace these two series, although the 1300 Series is still available (Tr. 69; PX Eldon 2 at 6; DX 5).

21. Eldon developed the plastic Image 1500 line because of a perceived need for desk accessories compatible with the contemporary trend in office designs (Tr. 65–66). Eldon wanted its new line, the designing of which began in 1978, to possess a high-tech, modern look. Mel Evenson designed the Image 1500 line (Tr. 229–230). This line did not utilize sharp angles and corners. The accessories have "radiused" (i.e., softened) edges and rounded corners to produce a soft look (Tr. 65–66). Radiused corners increase the strength of a product that is "thin-walled," a process where the thickness of a wall section is reduced (Tr. 364). While thin-walling may reduce the quantity of material used, it does not necessarily reduce its cost (Dep. of Szablak at 30–31; Dep. of Fowler at 129–130). Eldon wanted to have this line

ready for the 1979 National Office Products Association ("NOPA") show, an annual event at which various office product manufacturers display their goods (DX 4 at 2).

22. The Image 1500 line includes the 1570 Letter Tray (PX Image 2; PX Eldon 2 at 4) and the 1579 Legal Letter Tray (PX Image 3; PX Eldon 2 at 5). Each tray, composed of polystyrene, has a partially closed front. The base of the tray does not contain a trough. The bottom of the base of each tray contains four small, short circular legs, one in each rounded corner. The trays are stacked by using plastic 1539 Stacking Supports (Tr. 66–67, 71, 273–274; PX Image 1; PX Eldon 2 at 4). Each support, made of general purpose styrene, is approximately three inches long. One end contains a groove to fit over the edge of the lower tray. Towards the other end there is an extension of plastic into which the circular leg of the upper tray fits (Tr. 271; PX Image 1). There are no grooves on the tray itself (Tr. 238). Four stacking supports are needed to stack two trays. The user can stack both legal and letter trays together if he so desires.

23. Evenson reviews the products currently available in the marketplace when designing a new product or line of products. With respect to the development of the Image 1500 line, several products were reviewed. One of these was a plastic letter tray manufactured by McDonald Products called the Duk-it tray. This tray has a partially closed front, rounded edges, and four short circular legs on its bottom. The Duk-it legs, comprised of a soft, spongy material, are much larger than the Image 1500 legs (Tr. 193–194; PX Evenson 3; DX 3, 4). The Duk-it accessory has a deeper tray and longer supports than the Image tray (Tr. 278). The Duk-it tray utilizes four stacking supports which fit into two grooves located in the tray's side walls. A tray placed on top of the supports simply rests on top of them (Tr. 199–200; PX Evenson 3). The corners of the bottom of the Duk-it tray are nearly completely rectangular, with a hint of roundness (Tr. 200; DX 3). Evenson, at a New Product Development Committee Meeting held in January

1978, demonstrated how, in contrast to the Duk-it tray in his new design he had lowered the tray's bottom and reduced the opening at the front of the tray (DX 5).

24. At a similar meeting held in April 1978, the committee, including Evenson, Glen Church and Herbert Rome, reviewed McDonald, Rubbermaid, Glassform, Smith Metal Arts and Sterling Plastics trays (Tr. 196, 231). The Smith tray is a preassembled double tray; the two trays are screwed together, making the method of attachment visible. The Smith tray has a partially closed front end, but its front end is much more closed than that of the Duk-it tray (Tr. 231–234; PX Evenson 1). The Smokador tray is also a preassembled accessory. It also has a partially closed front end, but its front opening is larger than that of the Duk-it. The Smokador product uses pins to stack two trays; this method of attachment is also visible (Tr. 234; PX Evenson 2).

25. Other accessories in the Image 1500 line include a memo holder, a calendar holder, an ash tray, and a tape dispenser (Tr. 71; PX Eldon 2 at 4; PX Image 4, 5). Most of the line is in the permanent collection of a Grand Rapids museum (Tr. 242). The tape dispenser has been featured in New York City's Whitney Museum as an example of fine modern design (Tr. 217–218).

26. There is not, and never was, a design patent for the Image 1500 line (Tr. 198). None of the Image 1500 accessories is registered on either the Trademark Principal or Supplemental Register.

27. The soft look of the Image 1500 line was carried over by Eldon into its Emphasis 6000 line, also designed by Evenson, which utilized polished chrome, brass and antique bronze plating (Tr. 72, 221; PX Eldon 2 at 8; PX C–6 at 191). This line, aimed at the "higher-end design community," is more expensive than the Image 1500 line (Tr. 73–74). This line includes the 6070 Letter Tray (PX Image 6), the 6079 Legal Letter Tray (PX Image 7), the 6073 Memo Holder (PX Image 10), and the 6074 Calendar Holder (PX Image 11). The Emphasis 6000 line also contains pre-assembled stacking trays, the 6087 Double Letter Tray (PX Image 8) and the 6089 Double Legal Letter Tray (PX Image 9).

28. Eldon also carried over the soft look of the Image 1500 line to another Evenson-designed line, the Woodline 6500 Series. These office accessories are available in oak and walnut. The line contains the same accessories as the Emphasis 6000 line (Tr. 74–75, 222; PX Eldon 2 at 9; PX Image 12, 13, 14, 15; PX C–6 at 190). In addition, Eldon has recently used the Image 1500 soft look in a line of leather office accessories (Tr. 75, 251; PX Image 16).

29. There was no consumer testimony or survey evidence regarding whether the consuming public associated any of the designs claimed by Eldon to be entitled to trade dress protection with Eldon (or any single producer) prior to the introduction of the challenged Rubbermaid products.

*Rubbermaid's Products*

30. In 1973, Rubbermaid was marketing its SnapStack Letter Tray, a stacking side-loading tray. At one time this tray was available in a plastic known as general purpose styrene. This tray did not utilize a ribbed design. The top portion of each side wall contained three rectangular holes with soft rounded angles (Tr. 51, 266; PX Rubbermaid 4 at 6; Dep. of Crawford at 102–103). In approximately 1978, James Hampshire, a Rubbermaid Manager of Product Development, designed the legal size SnapStack tray (Tr. 614–615, 620). The legal size tray was advertised in Rubbermaid's 1979 catalogue (PX Rubbermaid 2 at 8).[4]

31. In its 1979 catalogue, Rubbermaid also offered its Designer II line. This line

---

**4.** At least as early as May 1, 1978, Rubbermaid utilized a six phase process when developing a new product. Before the process begins, the idea for the new product must be submitted to a Product Manager and a market survey conducted. The idea may then enter the process. The six phases are: (1) Market Research, (2) Design Concepts, (3) Market Verification, (4) Design Finalization, (5) Design Engineering, and (6) Tooling. The Product Manager is responsible for overseeing Phases I and III, the Project Designer, Phases II and IV, and various engineers, Phases V and VI (PX Rubbermaid 5).

included both letter and legal size trays. These trays did not simply stack upon themselves; rather, two rectangular risers were required to support the upper tray (PX Rubbermaid 2 at 5). This line is still available (PX Rubbermaid 3 at 6).

32. By January 1982, Rubbermaid was suffering serious breakage problems with the SnapStack molds. The molds were in constant need of repair (Tr. 621; PX Quick-Stack 7; Dep. of Crawford at 109; Dep. of Parker at 115; DX 20 at 3). Although this problem could have been remedied if the dovetails (the interlocking system) were redesigned, such action would have been costly (Tr. 671; DX 18). There was also a problem in that the trays were "over-engineered," that is, the structural quality of the trays was excessive given the functions for which they were designed, and as a result, they were too expensive to produce (Tr. 623).

33. In the early 1980's, Eldon was the leading manufacturer of stackable desk trays. According to Rubbermaid, Eldon then held 87% of the tray market, amounting to approximately seven million dollars in sales. Rubbermaid held 6%, based on sales of its SnapStack trays (PX Quick-Stack 2, 4; DX 18).

34. Rubbermaid developed the Quick-Stack line to replace the SnapStack products. Rubbermaid's express objectives in producing the QuickStack line were to replace Eldon as the market leader in plastic economy trays and "to design and develop a line of four self stacking letter trays that will be price competitive and interstack" with the Eldon stackable line (PX Quick-Stack 2, 4, 7). When designing the stacking portion of the QuickStack line, Rubbermaid took measurements from at least one Eldon Stackable (Tr. 678). The QuickStack trays interstack with the Eldon Stackables (Tr. 710). The QuickStack trays were not designed to interstack with SnapStack trays and do not do so (Tr. 52; Dep. of Crawford at 106).

35. The QuickStack trays, with the exception of the 2554 tray, are side-loading trays. None contains hand-holes. Each incorporates a cored rib design with spaces between the ribs transversing the entire width of each side wall. It also utilizes an embossed rib design (no coring) in the floor of the tray. The Rubbermaid logo is located on the bottom of the tray; it is not visible when the tray is in use (PX Quick-Stack 10).

36. The QuickStack line was also designed to be similar in appearance to the Eldon line, with colors in the same range as the Eldon colors (PX QuickStack 1, 2). In choosing colors, Rubbermaid telephoned various wholesalers to learn what the most popular colors being sold by Eldon were. The initial colors used by Rubbermaid were similar to the most popular Eldon colors (Dep. of Crawford at 149–150).

37. The QuickStack was initially made of general purpose styrene (PX QuickStack 4, 5). There were some breakage problems with the ribs of the QuickStack). It is now made of acronium nitrobutolidine styrene ("ABS") plastic and medium impact plastic (Dep. of Crawford at 113, 131, 202; Dep. of Szablak at 29). ABS plastic is a stronger material than general purpose styrene (Dep. of Parker at 123).

38. Before commencing production of the QuickStack line, Rubbermaid had its legal department review whether Rubbermaid might be infringing anyone's patents (PX QuickStack 3).

39. Rubbermaid manufactured its four sizes of the QuickStack (2551 letter, 2552 legal, 2553 EDP, and 2554 front-loading letter) in time to be displayed at the 1983 NOPA show (Tr. 637, 639).

40. The packaging of the Rubbermaid stacking trays makes clear that they are Rubbermaid products. The blue and white Rubbermaid logo is clearly displayed on the QuickStack packaging. Additionally, the names of Rubbermaid Commercial and Rubbermaid, Inc. appear on the packaging (DX 15).

41. An examination of the Rubbermaid QuickStack and the Eldon Stackable reveals that they are not identical. The Stackable contains a hand-hole on each side wall; the QuickStack does not—its ribs transverse the side wall. The side walls of

QuickStack contain a hot stamp area (for wood appliques) beneath the ribs; the Stackable does not—its ribs transverse the complete height of the side walls. The inside bottom of the Stackable is smooth; the inside bottom of the QuickStack is not—it is covered with an embossed rib pattern.

42. In approximately 1983, Eldon learned that Rubbermaid was manufacturing the QuickStack rather than the Snap-Stack. Eldon considered whether to institute legal action against Rubbermaid at that time. Eldon decided against legal action based on a number of considerations, including whether Eldon, a relatively small company, had the ability to sustain a lawsuit against Rubbermaid, a much larger company, and whether Eldon wanted to expend its manpower and resources on litigation. Furthermore, Eldon was aware that its design patent on the Stackable line was due to expire in approximately two years, prior to the probable conclusion of any litigation pursued. Eldon made no contact with Rubbermaid to express concern about possible infringement relating to the QuickStack (Tr. 52–53).

43. On January 6, 1986, Eldon applied for registration of its Stackable line on the Trademark Principal Register.[5] Eldon claimed a date of first use of June 23, 1969,[6] and an in commerce date of July 11, 1969.[7] The PTO denied this application April 10, 1986, on the asserted ground that the design configuration of the tray was merely descriptive and as such lacked secondary meaning. Eldon then amended its application to seek registration on the Trademark Supplemental Register.[8] In its amendment, Eldon stated that it was not agreeing with the position of the PTO that its design configuration lacked secondary meaning but was converting its application as a matter of expediency. Eldon received Trademark Supplemental Registration No. 1,403,589 on the Stackable desk tray line July 29, 1986 (Tr. 89; DX 31).

44. In March, 1986, Eastman, an important Eldon customer, complained to Eldon personnel that the smoke-colored Stackable trays it had purchased recently from Eldon were breaking more frequently than in the past. John Duncan, an Eastman representative, called Eldon's Church to tell him that a Rubbermaid salesman had come to Eastman to display a comparable Rubbermaid product. A strength test was performed by Eastman and the Rubbermaid salesman. They stood on each tray—Eldon's broke. Rubbermaid's did not (Tr. 170; DX 2).

45. In June 1986, Glen Church distributed to various regional managers and representatives a memorandum seeking their assistance in learning whether Rubbermaid's QuickStack trays were being substituted by dealers for orders for either the 1600 or 1601 Stackables. In part, the memorandum stated, "Substitution of their product for Eldon's would be considered to effect [sic] our trademark rights and is an important issue in our pursuit of Rubbermaid. We can cause this product item and its associated problems to go away by forcing Rubbermaid to withdraw from the market" (DX 35).

46. Rubbermaid produces other desk accessories, including a vertical sorter called the Snap File. The Snap File is part of Rubbermaid's Designer II line. Although developed prior to the QuickSnap, it is still available, now made of general purpose

---

5. A trademark owner may register his mark on the Principal Register. 15 U.S.C. § 1051. Such registration provides him with various protections against other parties' attempts to use his mark and is prima facie evidence that the mark is distinctive. *Olay Co. v. Cococare Prods., Inc.,* 218 U.S.P.Q. 1028, 1041 (S.D.N.Y.1983).

6. This is the date on which the product was first sold or transported to the benefit of the applicant. *Trademark Manual of Examining Procedure* 800–13 (rev. ed. 1986).

7. This is the date on which the product was first sold or transported in a type of commerce subject to Congressional regulation. *Id.*

8. Title 15 U.S.C. § 1091 provides:
 All marks capable of distinguishing applicant's good or services and not registrable on the principal register ... which have been in lawful use in commerce by the proprietor thereof, upon or in connection with any goods or services for the year preceding the filing of the application may be registered on the supplemental register....

styrene. It does not utilize a ribbed design (Tr. 426; PX QuickSnap 14; Dep. of Parker at 101–102; PX C–12 at M420). Rubbermaid has had a breakage problem with the Snap File (Dep. of Crawford at 127).

47. Rubbermaid began to design the QuickSnap in 1984 to compete with the Eldon Add-A-File (Tr. 642; PX QuickSnap 2). Rubbermaid Staff Designer Robert Jourdian designed the QuickSnap. Jourdian purchased an Eldon Add-A-File before he began to draft the QuickSnap, and he used the dimensions and shape of the Add–A–File in designing the QuickSnap (Tr. 703–704; Dep. of Jourdian at 4, 33–35). Rubbermaid, following its customary practice, tested the competitive product to determine the material of which it was composed (Dep. of Szablak at 120–121).

48. Rubbermaid utilized a cored rib design in the QuickSnap. In the initial design phase, the product's ribs were thinner than they are currently. They were subsequently widened because of mold considerations (Dep. of Parker at 126–127; Dep. of Jourdian at 53, 77–78, 127). Its ribs are of uniform width throughout its wall, unlike the Eldon version, which has a wider center rib (Tr. 262; PX QuickSnap 13). The Rubbermaid logo is located on the bottom of the QuickSnap, so it is not visible in advertising or when the product is in use (PX QuickSnap 13).

49. In designing the QuickSnap, Rubbermaid wished to achieve visual compatibility and interconnection with the Add–A–File. The Rubbermaid QuickSnap was specifically designed to interconnect with the Eldon Add–A–File. The two are actually capable of interconnecting. Before Rubbermaid introduced the QuickSnap to the marketplace, it revised the mold a number of times because the fit between the QuickSnap and the Add–A–File was viewed as unacceptable (PX QuickSnap 10; Dep. of Jourdian at 116–117).

50. The QuickSnap was also intended to complement Rubbermaid's QuickStack line (Tr. 646–647; DX 21 at 1). The QuickSnap is visually similar to the QuickStack line in that both utilize cored vertical ribs. They are also similar in color. Rubbermaid decided to use the QuickStack colors for the QuickSnap products. It planned to produce the QuickSnap out of general purpose styrene in 5 colors (PX QuickSnap 9; Dep. of Crawford at 149–150).

51. In many of its internal documents, Rubbermaid referred to its vertical sorter concept as the "Add–A–File" (PX QuickSnap 1, 3, 6, 7, 9). In one internal document, the QuickSnap was referred to as Rubbermaid's "Eldon Add–A–File knock-off" (PX QuickSnap 7).

52. During the preliminary injunction hearing, Allen Falls, a product manager for Rubbermaid Commercial's Office Products Division, misidentified, at a distance of some feet, a Rubbermaid QuickSnap as an Eldon Add–A–File (Tr. 519, 573). While recognizing that such a mistake may be due in part to factors such as the stress of testifying and the pace of the proceedings, it is evidence of the visual similarity of products, at least when not closely examined.

53. On March 16, 1989, Sam Clemens, an Eldon Regional Manager, went to the Warehouse Club, a discount store in Niles, Illinois. He noticed a sign identifying packages of Rubbermaid QuickSnaps as "Rubbermaid Add–A–File" (Aff. of Clemens). The Warehouse Club does not sell Eldon Add–A–Files (Aff. of Daly). Clemens purchased a package of QuickSnaps from that display; the register receipt identifies the product as an "Add–A–File" (Aff. of Clemens). Warehouse Club personnel, however, never believed that they were selling Eldon Add–A–Files rather than Rubbermaid QuickSnaps, and they are unaware of any Warehouse club customer who mistakenly believed that the Rubbermaid QuickSnap was an Eldon product (Aff. of Daly). This incident is not, in this court's view, probative of confusion.

54. Rubbermaid has developed other products in the QuickSnap line, including accessories not offered by Eldon to complement the Add–A–File. Rubbermaid made its decision to produce additional accessories in order to gain a sales advantage over Eldon: the Eldon line would be viewed as incomplete in comparison with the Rubber-

maid line, and therefore customers would purchase accessories from the more complete Rubbermaid line (PX QuickSnap 2 at 3).

55. Early in 1987, Michael Szablak, a Rubbermaid designer, was asked by Thomas Parker, a Rubbermaid manager, to consider whether the QuickSnap could be redesigned. Szablak explored various alternatives with Edward Tomblin, a product engineer. The alternatives included a modification of the ribbed design. Szablak gave Parker a list of possible changes (Dep. of Szablak at 137–140). There was no evidence that any of these changes was adopted.

56. The packaging of the QuickSnap makes clear that the QuickSnap's producer is Rubbermaid. The QuickSnap packaging contains the blue and white Rubbermaid logo. It also contains the names of Rubbermaid Commercial and Rubbermaid, Inc. (DX 16).

57. The Add–A–File and the QuickSnap are not identical. The width of the Quick-Snap ribs is uniform, while that of the Add–A–File is not, the center rib being noticeably wider than the others. The QuickSnap contains a small plastic protrusion on the top of its center rib, while the Add–A–File does not. The Add–A–File ribs continue towards its base; the QuickSnap ribs do not. The QuickSnap contains a hot stamp area; the Add–A–File does not. The dovetail system of the two products is different, but the two products nevertheless interlock (PX Add–A–File; PX QuickSnap 13).

58. In the autumn of 1985, Eldon's Evenson and Silverstein attended the NOPA show in Chicago. Both Evenson and Silverstein observed that Rubbermaid was displaying its QuickSnap and that this product resembled the Eldon Add–A–File (Tr. 58, 228–229; PX Eldon 9 at 1).

59. Following the 1985 NOPA show, Eldon's Silverstein wrote a letter dated October 16, 1985 to Rubbermaid's Gault regarding the similarity of the QuickSnap and the Add–A–File. Silverstein stated:

If you recall, when we met for lunch in Los Angeles, I expressed concern regarding the trend of Rubbermaid Office Products closely copying Eldon Office Products. To refresh your memory, I am enclosing a catalog of Eldon's "Stackable" trays which have been in Eldon's line for approximately 16 years, and one of Rubbermaid's "Quick Stack" trays which were introduced last year. There are other examples of products that have been closely copied by Rubbermaid.

(PX Eldon 9 at 1). Silverstein also expressed his concerns about other "closely copied" products, but did not identify any such products. He further informed Gault that he had seen the QuickSnap at the 1985 NOPA show, and had "instructed [Eldon's] attorneys to take whatever action the law permits" against Rubbermaid (PX Eldon 9 at 1).

60. On November 5, 1985, Eldon's executives, concerned about copying by Rubbermaid, compared the QuickSnap and Add–A–File. The similarities and differences between the two products were compared, and Eldon concluded that Rubbermaid did not duplicate the Add–A–File using a pantograph (a copying instrument) because of the "subtle differences" that existed between the two products. The study specifically revealed that the QuickSnap used four dovetails to Eldon's two and had shorter return slots, deeper recessed "feet," a thicker back panel, and a different gate than the Add–A–File. In January 1986, Eldon tested the fit between the two products. The Eldon tester concluded that the "fits var[ied], but would be acceptable to an end user" (Tr. 178–179; DX 34).

61. On January 15, 1986, in subsequent correspondence, Silverstein asked Gault either to cease selling the Add–A–File or to alter its appearance. Silverstein stated that if he did not hear from Gault in a month, he would authorize Eldon's counsel to institute legal action (PX Eldon 12). On February 12, 1986, Gault responded to Silverstein, stating that Rubbermaid's counsel had distinguished the Add–A–File from the QuickSnap. Gault requested a clarification of Eldon's legal position (PX Eldon 13). There is no evidence of any response by Silverstein.

62. Meanwhile, on January 6, 1986, before Silverstein wrote his January 15 letter to Gault, Eldon applied for registration of the design of the Add–A–File on the Trademark Principal Register. Eldon claimed 1969 dates of first use and in commerce. The application was denied by the PTO April 10, 1986, which determined that the design configuration of the Add–A–File was merely descriptive and as such lacked secondary meaning. On May 7, 1986, Eldon amended its application to one for registration on the Trademark Supplemental Register, stating, as it did with respect to the design of the Stackable tray, that it was not agreeing with the position taken by the PTO regarding the lack of secondary meaning, but was converting its application as a matter of expediency. Eldon received Trademark Supplemental Registration No. 1,403,588 for the design configuration of the Add–A–File on July 29, 1986 (Tr. 89; DX 32).

63. An Eldon salesman reported at an unspecified time that a dealer had substituted a QuickSnap for an Add–A–File in responding to a customer order. Although Eldon investigated whether this had occurred, it found no evidence of substitution (Tr. 179–180). The time frame during which the alleged substitution and ensuing investigation occurred is not evident from the record.

64. At approximately the same time that Eldon's Image 1500 line entered the market, Rubbermaid introduced its own higher-priced plastic tray line with a soft look—once called Form 1000, but now called Classic Form 1000. The softer radiused corners of the new Rubbermaid line were less subject to product and mold breakage than sharp-edged products (Tr. 692; Dep. of Imhof at 166–167). Eldon's Image 1500 line benefits similarly from the radiused edges (Tr. 364).

65. James Hampshire designed this new Rubbermaid line (Tr. 647–648). Hampshire spoke with various designers to learn what consumers wanted as far as shape, size, material and type of accessories before de-

ciding to use the Classic Form 1000 design (Tr. 686; PX Form 10001). His discussions indicated that the design, which was the subject of his discussions, would be "acceptable" (PX Form 10001 at 5). The Classic Form 1000 trays are completely open in front. Instead of legs, the trays use an extension of plastic on each side of the trays' bottoms which rest on a desk or other surface (PX Form 1000 24a). Each plastic extension is grooved so that the 2112 riser[9] can be attached. The Rubbermaid stacking supports are C-shaped and are much larger than and bear no resemblance to the Eldon 1539 stacking supports (Tr. 70; PX Form 1000 24b). Only two stacking supports are needed to stack two Rubbermaid trays in contrast to the four required in the Eldon Image series, although Rubbermaid had considered using four stacking supports at one time. Rubbermaid's marketing division found the use of four risers "unacceptable" (Tr. 699; PX Form 1000 3).

66. The Classic Form 1000 line was designed to compete directly with Eldon's Image 1500 line, which was to be introduced at the 1979 NOPA show. Internal Rubbermaid documents make clear that Rubbermaid was aware of Eldon's plans to market a "high-tech" design tray aimed at the lower end of the market (PX Form 1000 2). Rubbermaid wanted to introduce samples of the Form 1000 line at that show, and it made the deadline (Tr. 653; PX Form 1000 3). Eldon's Image 1500 line was also introduced at the 1979 NOPA show (Tr. 654). The original Form 1000 line was also advertised in Rubbermaid's 1979 catalogue (PX Rubbermaid 2 at 2–3).

67. Rubbermaid admits that there exists a strong similarity between the original Form 1000 and the Image 1500 lines. The two major differences in the products are the fronts of the trays (the Eldon trays have a partially closed front; the Rubbermaid trays have a completely closed front), and the size of the stacking supports, the Eldon supports being much slimmer than those of Rubbermaid (PX Form 1000 6 at

---

9. What Eldon calls "stacking supports," Rubbermaid calls "risers." They serve the same purpose. The court uses the terms interchangeably.

3). Rubbermaid's express objective behind designing the new line was "to design a range of products that a customer may freely substitute for Eldon" (PX Form 1000 7 at 1).

68. Rubbermaid subsequently decided to redesign the Classic Form 1000 tray to emulate more strongly the Eldon Image 1500 line. The line extension was designed by Michael Szablak, a Senior Project Designer. The redesigned line was to have a softer, high-tech modern look. The new design would incorporate a partially closed front and slimmer stacking supports, similar to the Eldon supports, in both letter and legal sizes. The trays also had four small, short circular legs, one in each radiused corner, as Eldon's did (PX Form 1000 25a, 25b; PX Form 1000 6, 7, 9; Dep. of Parker at 171; Dep. of Szablak at 4, 166). The bottom of each tray was to be contoured as was Eldon's (PX Form 1000 7).

69. Rubbermaid officials wanted to obtain corporate approval of the new Form 1000 line as soon as possible so that the new line could be displayed at the 1986 NOPA show (PX Form 1000 13, 16; Dep. of Szablak at 191). The redesigned line was presented for corporate approval in November 1985 and displayed at the 1986 NOPA show (Dep. of Szablak at 206; Dep. of Parker at 166–167).

70. At the same time that the extension of the Form 1000 line was being discussed, Eldon was experiencing some sales difficulties. An internal Rubbermaid memorandum stated, "Due to some poor selling practices, poor service levels, and poor managerial attention, many of our distributors are anxious to find a substitute for the Eldon products. One distributor went so far as to state that it was his desire 'to send Eldon a message'" (PX Form 1000 6 at 1).

71. The redesigned Form 1000 was designed to interstack with the Classic Form 1000 (PX Form 1000 15). The newly designed line was to supplement the Classic Form 1000 line for the time being, with the intention of eventually wholly eliminating the original line. The question as to exactly when the original line would be eliminated remained unanswered because some customers continued to order the Classic Form 1000 accessories (PX Form 1000 8, 13, 22). The original line was renamed Classic Form 1000; the redesigned line was called Form 1000 (PX Rubbermaid 3 at 4–5).

72. The redesigned Form 1000 line contains the 2131 Letter Size Tray, the 2130 Legal Size Tray, the 2132 Riser, as well as an ash tray, book end, calendar pad holder, and memo holder (PX Form 1000 6; PX Rubbermaid 1 at 1; PX Rubbermaid 3 at 4). It also contains a tape dispenser manufactured by a domestic company called Monoflow (Dep. of Szablak at 223–224). Monoflow also produced post-it note holders, clip holders and card holders for Rubbermaid (Dep. of Szablak at 232). Rubbermaid had the molds for these additional products made in Taiwan because they could be completed sooner in Taiwan (Dep. of Parker at 181).

73. Eldon personnel learned that Rubbermaid had redesigned the Classic Form 1000 line while attending the 1986 NOPA show (Tr. 76–77).

*Comparable Products in the Marketplace*

74. At some time prior to 1976, Sterling Plastics offered a tray for sale that was similar to, and capable of interstacking with, the Eldon Stackable. Eldon advised Sterling that this product infringed Eldon's patent rights. Eldon and Sterling entered a settlement agreement March 1, 1976 in which Sterling agreed to stop manufacturing the ribbed tray in issue for 15 years (Tr. 50, 205; DX 1). Sterling subsequently stopped the manufacture and sale of the tray (Tr. 50, 150–151). Sterling currently advertises and sells a product competitive with the Eldon Stackable that does not utilize a ribbed design and that does not interstack with the Eldon line. The Sterling product, generally priced lower than the Eldon product, comes in a variety of sizes (Tr. 45–46, 382; PX QuickStack 4 at 1; PX C–1 at 4–5).

75. W.T. Rogers ("Rogers") advertises and sells products competitive with the Eldon Stackables. Accessories in Rogers' "Stackette" line come in a variety of sizes.

The Rogers line does not utilize a ribbed design (Tr. 46–47; PX C–2 at 6–7; PX C–8 at 101). It interstacks with, and is less expensive than, its Eldon counterpart (Tr. 709; PX QuickStack 4 at 1).

76. Keene Manufacturing, Inc. ("Keene") advertises and sells a product competitive with the Eldon Stackable. One Keene product, not utilizing a ribbed design, comes in letter and legal sizes (Tr. 47; PX C–3 at 3). Keene also produces competitive products which utilize a vertical cored rib design—the Universal Letter Tray and the Universal Legal Tray. Both Keene products have side walls containing vertical ribs. The hand-holes in these trays are located in the middle of the side walls, rather than toward the end of the side wall as in the Eldon product (PX C–3 at 4).

77. Evco Office Products ("EVCO") advertises and sells a product competitive with the Eldon Stackable (Tr. 48; PX C–4). It does not contain a cored rib pattern similar to that of the Stackable (Tr. 438). EVCO's stacking trays are advertised as "compatible" with Eldon, Rubbermaid, and Sterling products (PX C–4).

78. As the evidence concerning other products in the marketplace makes clear, low cost plastic desk trays can be designed in various ways without utilizing vertical ribs (Tr. 35–36, 395–397). There are many other designs which provide comparable structural support (Tr. 675).

79. There are numerous design alternatives to Eldon's Add–A–File design available to a person who wishes to market a low-cost modular vertical sorter. For example, Sterling advertises and sells a product competitive with the Eldon Add–A–File, the 293 Extend–A–File. It does not utilize a ribbed design. Its wall is decorated with vertical lines and has a hand-hole at its top (PX C–1 at 8–9; Dep. of Fowler at 134).

80. Rogers currently advertises and sells a product competitive with the Eldon Add–A–File, the Extend–A–File. It does not utilize a ribbed design (Tr. 428–429; PX C–2 at 18; Dep. of Fowler at 134). This product does not interconnect with the Add–A–File (Dep. of Crawford at 62).

81. Keene currently advertises and sells products competitive with the Eldon Add–A–File, the 1005 Expanding File and the Universal Expanding File. The 1005 model does not utilize a ribbed design (PX C–3 at 3). The Universal model, on the other hand, does utilize a cored rib design. The wall of this tray contains vertical ribs with spaces transversing the side walls (PX C–3 at 4).

82. In addition to the McDonald Duk-it tray and other trays described above, there are numerous soft look plastic stacking trays in the market. Tenex has a line of soft look plastic desk accessories—"My Way." The line is advertised in various catalogues along with the Image 1500 and Form 1000 lines. The My Way prices are comparable to the Eldon and Rubbermaid prices (PX C–7 at 2–8; PX C–9 at 148).

83. Smith Metal Arts produces a plastic tray with soft, radiused corners (DX 24). The 8900 series of Globe–Weis Office Products Group, a division of Sheller–Globe Corporation, includes a soft look stackable letter tray (DX 26). In addition, Glassform Architectural Products produces a tray in its Group II line that has a soft look, but not as radiused as that of the Image 1500 line (DX 27 at 3). Business Accessories Inc. also produces a soft look stacking tray (DX 25 at 9).

84. Other companies have carried their soft look over into products made of more expensive metals, woods and leather. They include McDonald (DX 23), Business Accessories, Inc. (DX 25), Polar Manufacturing Company's 100 Treasure Series and 2800 Collection Desk Accessories (DX 28 at 3, 12), BPC Industries Basics (DX 29) and Metcor (DX 30).

*Evidence Concerning the Products at Issue in the Marketplace*

85. This finding, which sets forth sales figures, is being filed under seal.

86. This finding, which sets forth sales figures, is being filed under seal.

87. This finding, which sets forth sales figures, is being filed under seal.

88. This finding, which sets forth sales figures, is being filed under seal.

89. This finding, which sets forth sales figures, is being filed under seal.

90. This finding, which sets forth sales figures, is being filed under seal.

91. Eldon does not distribute its products directly to the end user. It sells to office products dealers, such as Horder's, and office products wholesalers, such as Boise–Cascade Mega and United Stationers (Tr. 100–101). These companies (which include Boise–Cascade Maxi, McKesson, Marathon, S.P. Richards, United Stationers, and Philadelphia Stationers) publish office products catalogues in which Eldon and Rubbermaid products are advertised (Tr. 109–110; PX C–5–C–12). In some of these catalogues, the competitive Eldon and Rubbermaid products are displayed either on the same page or on facing pages (PX C–6 at 216–217; PX C–7 at 2–24–2–25; PX C–8 at 102–103; PX C–9 at 158).

92. The ribbed designs of the Add–A–File and the QuickSnap are clearly visible in the various catalogues submitted to this court. In every Office Products catalogue submitted to the court, the viewer can also plainly see that the center rib of the Add–A–File is wider than the other ribs (PX C–5—C–12).

93. In the 1988 Office Products catalogues offered in evidence, the Eldon Add–A–File generally sells for approximately $2.09 or $2.29 per unit, while the QuickSnap sells for $1.95 per unit (PX C–5–C–12).

94. The 1988 Philadelphia Stationers, the 1988 Boise–Cascade Maxi and the 1988 United Stationers catalogues feature the Add–A–File but not the QuickSnap (PX C–5 at 266; PX C–9 at 161; PX C–10 at 143).

95. In the 1988 Office Products catalogues offered in evidence, the parties' ribbed stacking trays are priced approximately as follows:

| Eldon | Rubbermaid |
|---|---|
| 1600–$4.19 | 2551–$3.95 |
| 1602–$5.79–$6.49 | 2552–$5.75 |
| 1604–$7.98–$8.49 | 2553–$7.95 |
| 1607–$5.49–$5.98 | 2554–$4.95 |

(PX C–5—C–11).

96. The 1988 Philadelphia Stationers catalogue advertises "Stacking Trays from Eldon and Rubbermaid" on one page. All four sizes of the Stackables are advertised, while only the letter size Rubbermaid tray is included (PX C–10 at 156). The 1987 United Stationers catalogue also features on one page the four Eldon trays and the one letter size Rubbermaid tray (PX C–11 at 161).

97. The visibility of the QuickStack's ribs in the 1988 S.P. Richards catalogue is poor, but good with respect to those of the Stackable (PX C–8 at 102–103). In the photographs in the 1988 McKesson Office Products catalogue, the ribbed design of the QuickStack trays photographed poorly. The ribs of the Stackable are visible only in a portion of the advertisement (PX C–6 at 203–204). Therefore, in some advertisements, the similarity in appearance between the two competing lines is not readily noticeable. The hand-holes on the Stackable, however, are visibly noticeable in all the catalogues.

98. The 1988 Office Products catalogues offered in evidence reveal the following price ranges per unit for the Image 1500 and Form 1000 accessories:

| Eldon | Rubbermaid |
|---|---|
| 1539–$8.49–$8.98 | 2131–$8.49–$8.50 |
| 1570–$10.98–$11.98 | 2130–$10.98–$11.00 |
| 1579–$3.98–$4.29(4) | 2132–$3.79–$3.80(4) |

(PX C–5–C–11).

99. In the photograph in the 1988 McKesson Office Products Catalogue, the Form 1000 trays are depicted with risers, while the Image 1500 trays are not (PX C–6 at 194, 199).

100. Both companies display their products annually at the NOPA show. Eldon also advertises its products in a variety of trade publications, as well as through promotional flyers (Tr. 95; PX Eldon 3–4). The Image 1500 tape dispenser has been advertised in *Time* magazine, a national publication (Tr. 99; PX Eldon 4).

101. Eldon does not keep a record of how much money is spent per product on advertising expenses (Tr. 95, 171). Between 1973 and 1984, Eldon spent approximately $6,000,000 on advertising for all of its products, including products not at issue in this lawsuit. It spent approximately

$1,200,000 on advertising in 1984 and again in 1985 (Tr. 97). According to Rome, the bulk of Eldon's advertising expenses relate to the office products that are at issue in this lawsuit (Tr. 204). In addition, promotional advertising expenses are incurred when Eldon gives an office product dealer an extra discount in exchange for that dealer's agreement to advertise Eldon products at a discount. For 1986, promotional advertising expenses were approximately $2,000,000 (Tr. 97–98).

102. All of Eldon's advertisements contain the Eldon name. Eldon also includes the names of its products, which are registered trademarks, i.e., "Add–A–File," in its advertisements (Tr. 173–174; PX C–5–C–12; PX Eldon 3–4). None of Eldon's advertisements refer to trademark rights in the trade dress or overall appearance of its products.

103. Eldon contends that "every sale Rubbermaid makes is a sale we don't make." However, no evidence was introduced to establish why consumers who choose Rubbermaid do so, nor was evidence introduced as to how other competitors are faring in the marketplace. Accordingly, there is no basis for a finding that every Rubbermaid sale would have gone to Eldon, absent the similarity of the parties' designs.

104. This finding, which sets forth sales figures, is being filed under seal.

105. This finding, which sets forth sales figures, is being filed under seal.

106. This finding, which sets forth sales figures, is being filed under seal.

107. This finding, which sets forth sales figures, is being filed under seal.

108. This finding, which sets forth sales figures, is being filed under seal.

109. This finding, which sets forth sales figures, is being filed under seal.

110. This finding, which sets forth sales figures, is being filed under seal.

111. This finding, which sets forth sales figures, is being filed under seal.

112. This finding, which sets forth sales figures, is being filed under seal.

113. This finding, which sets forth sales figures, is being filed under seal.

114. This finding, which sets forth sales figures, is being filed under seal.

115. This finding, which sets forth sales figures, is being filed under seal.

116. A comparison of the Image 1500 and Form 1000 units sold show that even using Eldon's partial 1987 figures, Eldon holds a much larger portion of the low cost, soft look stackable tray market.

117. Eldon is unaware of consumer complaints concerning lack of proper fit between the Eldon and Rubbermaid trays or their vertical sorters (Tr. 178). The evidence indicated that the interconnection between the competing products, while "acceptable" according to Eldon's own testers, is less successful than the interconnection between matched Eldon products (DX 34). It should also be noted that even if the competing products currently interconnect adequately, products manufactured in the future might not fit as successfully because of injection mold wear. If a consumer with an Eldon product attempted to interconnect a Rubbermaid product, and if the fit were poor, and if the consumer did not realize that the Rubbermaid product was not an Eldon product, Eldon's reputation would be adversely affected (Tr. 64, 114–115).

*Evidence Relating to the Impact of an Injunction on Rubbermaid*

118. Norm DeCost, Rubbermaid Commercial's Vice–President of Product Engineering, testified as to the comparative costs of manufacture between the original Rubbermaid products and the products which replaced them, i.e., the SnapStack replaced by the QuickStack, the Snap File replaced by the QuickSnap, and the Classic Form 1000 replaced by Form 1000. Don Murray, defendants' vice-president of accounting, did the calculations upon which DeCost relied during his testimony. DeCost reviewed the underlying documentation and calculations with Murray prior to testifying (Tr. 462, 485–486). The court finds that DeCost was a competent and credible witness to testify on cost analysis.

119. Four factors are figured into the basic manufacturing cost of a Rubbermaid product—materials (amount of pounds of plastic used per unit), accessories (not used in current analysis; would include packaging), direct labor (number of hours expended to manufacture each unit), and overhead (Tr. 466, 494; DX 13). Advertising is not calculated into this basic cost (Tr. 512).

120. This finding, which details production costs, is being filed under seal.

121. The use of the cored rib design in the QuickStack and the QuickSnap accounted for a reduction in material cost. The slimmer Form 1000 riser also accounted for a reduction in material cost (Tr. 481–482).

122. If production of the QuickStack is enjoined, there is no mold immediately available to substitute for the QuickStack line because the SnapStack mold was destroyed. The SnapStack engineering drawings, however, still exist (Tr. 510–511, 531).

123. Eldon contends that Rubbermaid's Designer II line of trays can be substituted for the QuickStack line. The Designer II trays are more expensive than the QuickStack trays, and require the use of risers which are purchased separately at additional cost (PX C–8 at 91, 102).

124. This finding, which sets forth manufacturing costs, is being filed under seal.

125. This finding, which sets forth manufacturing costs, is being filed under seal.

126. The court finds that neither the SnapStack nor the Designer II trays would provide an equally competitive substitute for the QuickStack line were its sale enjoined.

127. The Snap File mold still exists and is currently being used (Tr. 511).

128. This finding, which sets forth manufacturing costs, is being filed under seal.

129. This finding, which sets forth manufacturing costs, is being filed under seal.

130. Eldon's Rome expressed his opinion that if production of the QuickSnap were enjoined, Rubbermaid could alter parts of the current mold rather than create a new mold when designing a replacement for the QuickSnap. Rome estimated that these changes would cost approximately $25,000 per cavity (Aff. of Rome at 2–3, ¶ 13).

131. The evidence is insufficient to permit the court to determine precisely what Rubbermaid's redesign costs would be. Its impression is that the costs would fall somewhere between the parties' conflicting estimates.

132. The Classic Form 1000 molds still exist and are currently in use (Tr. 511). The line, however, is visibly different from the Form 1000 line.

133. This finding, which sets forth manufacturing costs, is being filed under seal.

134. This finding, which sets forth confidential sales data, is being filed under seal.

135. If Rubbermaid cannot make sales of its existing products during the period in which it is developing new products, it will be unable to fill existing orders and re-orders and is likely to experience some loss of good will and credibility in the marketplace (Tr. 547–548).

### RECOMMENDED
### CONCLUSIONS OF LAW

Eldon seeks an order preliminarily enjoining defendants from manufacturing and selling four Rubbermaid QuickStack filing trays (letter size, legal size, data size and front-loading letter size), Rubbermaid's QuickSnap vertical filing system and three Rubbermaid Form 1000 products (letter size trays, legal size trays and risers) on the grounds that:

(1) Rubbermaid's "QuickStack" filing trays infringe Eldon's registered trademark rights and its trade dress rights in the nonfunctional design of Eldon's "Stackable" trays;

(2) Rubbermaid's "QuickSnap" vertical files infringe Eldon's registered trademark rights and its trade dress rights in the nonfunctional design of Eldon's "Add–A–File" vertical file; and

(3) Rubbermaid's "Form 1000" products infringe Eldon's trade dress rights in the design of the Eldon "Image 1500" trays and supports.

In determining whether plaintiff is entitled to a preliminary injunction, the court must consider and weigh the following factors:

1. Whether plaintiff has shown a reasonable likelihood of success on the merits;

2. Whether plaintiff has an adequate remedy at law or will be irreparably harmed if an injunction does not issue;

3. Whether the threatened injury to plaintiff if the injunction does not issue outweighs any harm that may accrue to defendants from the requested injunction; and

4. Whether the granting of the preliminary injunction will serve or disserve the public interest.

See *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986). At the preliminary injunction stage, plaintiff need demonstrate only that it has more than a "negligible" chance of succeeding on the merits. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988). If plaintiff demonstrates some likelihood of success on the merits, the court must examine that likelihood with respect to the balance of hardships. The greater the chances that plaintiff will succeed, the less likely the balance of harms needs to weigh in plaintiff's favor. Conversely, the less likely plaintiff's chances of succeeding on the merits, the greater the need for the balance of harms to weigh in its favor. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir.1984).

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

Eldon brings this action under § 32(1) and § 43(a) of the Lanham Act, 15 U.S.C. § 1114(a) and 15 U.S.C. § 1125(a), respectively. Section 32(1) provides redress against a party who uses a mark similar to the complainant's registered mark where "such use is likely to cause confusion, or to cause mistake, or to deceive." Liability under § 32(1) depends upon "whether the public is likely to be deceived or confused by a given practice." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 911 (Fed.Cir.1984). Section 43(a) of the Lanham Act provides a civil remedy for the use, "in connection with any goods or services, or any container or containers for goods," of "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same...." Section 43(a)'s general purpose " 'is to reduce the cost of information to consumers by making it easy for them to identify the products or producers with which they have had either good experiences, so they want to keep buying the product (or buying from that producer), or bad experiences, so that they want to avoid the product or producer in the future.' " *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1182 (7th Cir.1989), *quoting W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 338 (7th Cir.1986). Section 43(a), although frequently invoked in connection with claims of trademark infringement, is not limited to that type of unfair competition. *Schwinn, supra* at 1182.

Plaintiff's registration on the Supplemental Register satisfies the registration requirement of § 32(1). *See Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 257 (2d Cir.), *cert. denied*, 371 U.S. 910 [83 S.Ct. 253, 9 L.Ed.2d 170] (1962). Since registration on the Supplemental Register means merely that the Commissioner has found that the mark in question is "capable of distinguishing" the registrant's goods or services, and does not establish that the mark is in fact distinctive, a party suing under § 32(1) for infringement of a mark registered on the Supplemental Register must establish secondary meaning,[13] as well as a likelihood of confusion. *See California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451 (9th Cir.1985). Accordingly, the elements plaintiff must establish

---

**13.** Secondary meaning, defined more fully below, connotes the consuming public's association of a producer's trademark or trade dress with a single source or, in other words, the consuming public's apprehension of the mark as a source designator.

to succeed on its § 32(1) claim and its § 43(a) claim are essentially the same.

In this case, plaintiff contends that Rubbermaid is guilty of infringing plaintiff's "trade dress." Trade dress is the physical form in which a user presents his product to the marketplace. *Keystone Camera Products Corp. v. Ansco Photo-Optical Products Corp.*, 667 F.Supp. 1221, 1225 (N.D.Ill.1987). It has been described as consisting of the arbitrary, non-functional elements of the product. *See Vaughan Mfg. Co. v. Brikam Int'l Co.*, 814 F.2d 346, 348 (7th Cir.1987).

In a trade dress infringement action, the plaintiff must demonstrate either that its trade dress is inherently distinctive, or that its trade dress, although not inherently distinctive, has become distinctive by acquisition of secondary meaning. *Schwinn, supra* at 1182; *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1266 (7th Cir.1989). "Secondary meaning" connotes a mental association in consumers' minds between the appearance of the product and the product's source. *Echo, supra* at 1266. The consumer need not be aware of the identity of the source, but must understand or recognize the trade dress or trademark as indicating that the product comes from a single source, albeit an anonymous one. *Id.* at 1266–1267. The establishment of secondary meaning entitles the owner of a mark to protection against infringement, unless it is determined, as explained more fully below, that the mark is "functional." *See Keystone, supra* at 1229. Once a plaintiff demonstrates either that its trade dress is inherently distinctive or that it has acquired secondary meaning, it must then establish that the allegedly infringing product creates a likelihood of confusion in the minds of consumers as to the source of the products. *Schwinn, supra* at 1183 n. 14.

Even if plaintiff succeeds in showing that its trade dress is inherently distinctive or has acquired secondary meaning, and that defendants' products create a likelihood of consumer confusion, defendant may nevertheless prevail if it can demonstrate that the trade dress which it has allegedly infringed is "functional," that is, that the feature plaintiff is attempting to protect is a feature "that competitors would find necessary to incorporate into their product in order to be able to compete effectively." *Vaughan Mfg., supra* at 349. The feature may serve a "function" without being "functional" as long as there are other designs having the same functional advantages which competitors could adopt. *Id.* at 349–350. In determining whether a given trade dress is functional, the overall trade dress must be assessed. *Id.* at 350. Defendant may not prevail by showing that each of the various components that make up the plaintiff's trade dress is optimal for its purpose; it must rather demonstrate that plaintiff's design as a whole is superior to other designs. *Id.*

### A. Eldon's Trade Dress Contentions Regarding Its Stackable and Add-A-File Products

Eldon contends that Rubbermaid has infringed its trade dress by copying its distinctive design configuration, visually dominated by vertical ribs and composed additionally of elements of color, material, size, shape and interconnectability. Eldon does not claim that its designs are inherently distinctive, but it does contend that its designs have acquired secondary meaning and are therefore protectable under §§ 32(1) and 43(a) of the Lanham Act. Eldon further contends that Rubbermaid's designs create a likelihood of confusion on the part of consumers as to the source of Rubbermaid's products. *See Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, 1159 (N.D.Ill.1987). Rubbermaid disputes that Eldon's designs have acquired secondary meaning and disputes that its own products' designs create a likelihood of consumer confusion; it further contends that the design configurations Eldon claims Rubbermaid has infringed are functional, that is, they are "necessary to afford a competitor the means to compete effectively." *Schwinn, supra* at 1188.

### 1. Secondary Meaning

A product attains secondary meaning when the consuming public associates its

particular trade dress with a single producer. *Vaughan Mfg. Co. v. Brikam Int'l,* 814 F.2d 340 [346], 348 (7th Cir.1987). The consumer need not be aware of the identity of the producer but must associate the trade dress with a single, even if anonymous, source. *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 856 (7th Cir.1982). Secondary meaning exists when, and only when, "the primary significance of the [mark or dress] in the mind of the consuming public is not the product but the producer." *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 787 (5th Cir.1984). The user claiming that secondary meaning is present must demonstrate that its product attained secondary meaning prior to the entry of the junior user's product into the marketplace. *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980); *Can Am Engineering Co. v. Henderson Glass, Inc.,* 620 F.Supp. 596, 602–603 n. 7 (E.D.Mich.1985), *aff'd,* 814 F.2d 253 (6th Cir.1987).

Determining whether secondary meaning has been attained requires an examination of the senior product's place in the market, the funds expended in marketing that product, and the frequency of the appearances of the trade dress. *See Vaughan Mfg., supra* at 349. Other relevant factors include the length and manner of use of the trade dress in issue, the scope and manner of advertising and promotional efforts, the volume of sales, instances of actual confusion, consumer testimony and survey evidence. *See id.; Bank of Texas, supra* at 787; *Keystone Camera Products Corp. v. Ansco Photo-Optical Products Corp.,* 667 F.Supp. 1221, 1231 (N.D.Ill. 1987). Proof of intentional copying is probative of secondary meaning although not conclusive. *Vaughan Mfg., supra* at 349.

Eldon introduced its "Stackable" line of office trays in 1968. It applied for and received a design patent for the design of the tray valid from 1971 through 1985. As far as this court can ascertain from the record, Eldon enjoyed exclusive use of its ribbed stacking tray configuration until approximately 1976, when Eldon learned that Sterling Plastics was marketing a stacking letter tray with a ribbed design.[14] When Eldon advised Sterling that Sterling was infringing Eldon's design patent, Sterling agreed to withdraw its product from the market. By the late 1970's, Eldon was utilizing its ribbed design for all four sizes of its Stackable line trays.

At about the same time that Eldon created the Stackable, it created a modular vertical file which it called the "Add–A–File." It obtained a design patent on the Add–A–File valid from 1971 to 1985. The Add–A–File, like the Stackable trays, was visually dominated by a vertical cored rib design. There was no indication that prior to 1985, any other manufacturer offered a vertical sorter with a cored rib design, although at some point during the 1970's, Sterling Plastics marketed a hanging wall file with an embossed, uncored, vertical rib pattern.

Following the introduction of the Stackable line, Eldon employed its cored rib design on a number of other products, including a side-loading printer stand, a mobile printer cart, and a note rack. It used an embossed (uncored) rib design on various other sorters beginning in 1979.

Between 1968 and 1983, Eldon sold over 18 million Stackable units. Between 1979 and 1985, Eldon sold over 11 million Add–A–File sorters. It is undisputed that Eldon led the market for plastic stackable letter trays, with Rubbermaid estimating in its internal documents that in 1982, the Eldon Stackable line held 87% of the stacking tray market. It was not shown what market share was held by the Add–A–File line, but it is clear it was a highly successful product. Between 1973 and 1984 Eldon spent approximately $6 million on advertising its entire line of office products. It spent $1.2 million on advertising its entire line each year in 1984 and 1985, the approximate time that its design patents were

---

14. While the court frequently refers to Eldon's alleged trade dress as its ribbed design, it should be understood that the entire design configuration, not just the ribs, constitutes the claimed trade dress.

expiring. It spent an additional $2 million a year on promotional activities in 1986 and 1987.[15] Eldon advertises in office products catalogues, trade magazines and at least one national publication. Eldon also displays its products at the annual NOPA show.

This evidence, summarized, establishes that prior to 1983, Eldon, then holding design patents on the ribbed products at issue here, was a dominant market force, with essentially exclusive use of its cored rib design on two product lines and assorted other products. It advertised extensively in trade media and enjoyed substantial revenues.[16]

Despite the uncontrovertible evidence of Eldon's success with its Stackable and Add–A–File lines, the evidence leaves the court with substantial doubt that consumers associated the ribbed design with one source. The ribbed design of the Eldon products is a common geometric pattern. While Eldon's designers' creativity in utilizing such a simple and common design led to the creation of a highly attractive, popular and profitable product, there is little in the record to suggest that the primary significance of the ribbed design in the minds of consumers was a single office products manufacturer. *See generally Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118 [59 S.Ct. 109, 113, 83 L.Ed. 73] (1938). Eldon produced no direct evidence of the existence of secondary meaning, such as consumer testimony or surveys. Of course, it is not required to do so. *See Vaughan Mfg., supra* at 349. Yet nothing in the simple geometric configuration of these products or in the manner in which Eldon promoted them suggests either that Eldon attempted to educate the public to associate the design with its producer or that it succeeded in doing so. *See Porter Broadcasting Corp. v. Pyramid Broadcasting*, 635 F.Supp. 37, 38–39 (W.D. N.Y.1985).

The fact that Eldon enjoyed the virtually exclusive use of its design configuration for years was the result of its design patents—it had a legal monopoly on the designs. While an extensive period of exclusive use of a design may lead to the establishment of secondary meaning, it does not itself demonstrate that secondary meaning was acquired. *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 788 (5th Cir.1984).

**15.** Eldon was unable to separate the expenses attributable to a particular product or product line.

**16.** Arguing that the Eldon design patents were invalid in that Eldon committed a fraud upon the PTO in failing to name Gordon MacKay as an inventor of the subject designs in Patent Nos. 220,633 (the Add–A–File) and 220,014 (the Stackable), Rubbermaid contends, citing 35 U.S.C. § 256, that "Eldon should be barred by its unclean hands from using the period of time that the patents were in force in an attempt to establish secondary meaning." Rubbermaid's Post Preliminary Injunction Hearing Brief at 31. Section 256 provides that an error regarding the inventor(s) named in an issued patent may be corrected where "such error arose without any deceptive intention" on the part of the named inventor. *Dee v. Aukerman*, 625 F.Supp. 1427, 1430 (S.D.Ohio 1986). Section 256 thus provides a remedy for innocent errors where the name of an inventor was inadvertently deleted or joined in the design patent. *Bemis v. Chevron Research Co.*, 599 F.2d 910, 912 (9th Cir.), *cert. denied*, 444 U.S. 966 [100 S.Ct. 454, 62 L.Ed.2d 378] (1979). The section does not deal with fraud on the PTO, Rubbermaid's theory here.

When § 256 is invoked to correct errors in an existing patent, the burden of proving "without deceptive intention" is on the named inventor. *See Dee, supra* at 1430. When a defendant is claiming fraud on the PTO, however, the defendant has the burden of proving fraud.

"Fraud on the PTO" is also known as inequitable conduct. *See J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822 [106 S.Ct. 73, 88 L.Ed.2d 60] (1985); *FMC Corp. v. Manitowac Co., Inc.*, 654 F.Supp. 915, 934 (N.D.Ill.), *aff'd*, 835 F.2d 1411 (Fed.Cir. 1987). The proponent of the theory must show, by clear and convincing evidence, that the information withheld from the PTO was material, was withheld in bad faith, and that balancing of the materiality and intent factors shows that inequitable conduct has occurred. *In re Jerabek*, 789 F.2d 886, 889–890 (Fed.Cir.1986); *J.P. Stevens, supra* at 1559–1560.

The only evidence offered by Rubbermaid with respect to the omission of Gordon MacKay's name from the design patents was that his name was omitted (Tr. 186–192). Rubbermaid did not offer any evidence respecting the intent of Rome and Paulson. Rubbermaid has thus failed to establish grounds for a finding of the invalidity of Eldon's patents.

Advertising and commercial success are other factors relevant to the determination of whether secondary meaning exists, but they are insufficient standing alone to prove secondary meaning. *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.*, 724 F.2d 357, 361 n. 2 (2d Cir.1983). Eldon's advertising, while it pictures its products, does nothing to emphasize the cored rib configuration. Indeed, as the PTO found in rejecting Eldon's application to register the Stackable and Add–A–File on the Principal Register:

> While long use and advertising expenditures are an aid in indicating applicant's intent to use such a design as a mark in the eyes of the public, such evidence alone does not indicate that the purchasing public recognizes such a design as performing a trademark function. . . .

> The advertising material of record gives no indication that the configuration of the goods are promoted to the relevant purchasing public as a secondary source indicator. An illustration of the product, without further explanation or clarification as to significance of the shape, is the only material presented in the advertising material of record. No distinction may readily be drawn between the illustration of the identified goods and other office products identified in the same advertising material.

(DX 31–32) (citations omitted).[17]

Eldon has shown beyond doubt that Rubbermaid modeled its products after Eldon's, attempting to achieve a similarity of appearance without making every detail identical. Such copying evidence is probative of secondary meaning because it is assumed that "the junior competitor would not have copied the trade dress if not seeking to benefit from the trade dress's favor among buyers." *Vaughan Mfg., supra* at 349. In this case there is no question that Rubbermaid knew that consumers found the Eldon design extremely attractive and wished to capitalize on Eldon's design success. For reasons explained more fully below, however, it is much less clear that

Rubbermaid intended to confuse the public as to the source of its products. On this record it does not appear to follow necessarily from the fact of Rubbermaid's copying that consumers associated Eldon's cored rib design with a single source. *See generally Keystone Camera Prods. v. Ansco Photo–Optical Products Corp.*, 667 F.Supp. 1221, 1231 (N.D.Ill.1987).

Based on this evidence, the court concludes that Eldon, while introducing enough evidence to create a triable question on the issue of secondary meaning, has not to this point demonstrated that it is likely to succeed on this issue at trial. Since Eldon has presented some evidence, however, the court proceeds to the issue of likelihood of confusion.

### 2. Likelihood of Confusion

In trademark infringement actions, the Seventh Circuit considers seven factors as bearing on the confusion issue: "distinctiveness of the trademark in issue, similarity of the marks, similarity of the products, similarity in the channels of distribution, identity of advertising media utilized, the intent of the alleged infringer, and evidence of actual confusion." *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 354 (7th Cir.1983). None of the seven factors is dispositive; rather, the factors weigh differently depending on the facts of each case. *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1168 (7th Cir.1986). Three of those factors, however—similarity of the marks, the intent of the alleged infringer, and evidence of actual confusion—are generally considered the most important factors in the analysis. *Ziebart Int'l Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 226 (7th Cir.1986). "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986).

---

**17.** The examiner's opinion is entitled to some deference. *Linn Camera Shop Inc. v. Meijer, Inc.*, 559 F.Supp. 175, 181 (W.D.Mich.1982).

The similarity of advertising media used and channels of distribution are not contested here and clearly weigh in Eldon's favor. Both parties' products are advertised in and distributed through office products catalogues and trade publications, as well as at office products stores such as Horder's. They are also displayed annually at the NOPA show. In addition, the products are manifestly similar: the Eldon Stackables and Rubbermaid QuickStacks and the Eldon Add–A–File and Rubbermaid QuickSnap serve exactly the same function.

With respect to similarity of the trade dresses in question, the court also concludes that Eldon has shown that it is likely to prevail. The trade dresses of the competing products, while not identical, are very similar. While on close examination many distinguishing features can be identified, on superficial examination, the products' dominant cored rib design and comparable shape, size and color create an impression of similar products. The sides of the Eldon tray have a hand-hole, it is true, and its ribs transverse the height of the side, while the Rubbermaid tray's ribs transverse the side's entire width, without a hand-hole, and terminate ¾ of the way down the side, making room for a hot stamp area. The bottom of the Eldon tray is smooth, while the Rubbermaid tray has troughs. There are minor differences in the shape of the cut-out portions of the bottom and back. With respect to the companies' vertical files, Eldon's contains a center rib wider than the rest, while the Rubbermaid product's ribs are uniform. The Add–A–File ribs run to its base; the QuickSnap ribs terminate at a hot-stamp area above the base. But these differences, easily noticeable when the products are scrutinized for points of distinction, do not detract from the similarity of appearance created by the products' similar color, size, interlocking configuration, overall shape and dominant cored rib design. The similarity of the products' trade dress was demonstrated by Allen Falls, Manager of Rubbermaid's Office Products Division who, during his trial testimony, on quick visual examination admittedly at some distance, mistook Rubbermaid's QuickSnap for an Eldon Add–A–File (Tr. 573).

Whether the trade dresses are similar enough to cause confusion must be judged by considering each mark in its entirety. *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands, Inc.*, 261 F.Supp. 200, 205 (N.D.Ill.1966), *aff'd*, 394 F.2d 833 (7th Cir.1967). It is inappropriate to concentrate on minor stylistic variations when examining the similarity of marks. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir.1988). "Exact similitude" is not a requisite to a finding of infringement. *Source Services Corp. v. Source Telecomputing Corp.*, 635 F.Supp. 600, 606 (N.D.Ill.1986). Looking at the products for the overall impression they create, this court has no difficulty concluding that Eldon has adequately demonstrated the similarity of the designs in question. *See Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 432–433 (5th Cir.1984).

In determining the likelihood of confusion, the court must also assess the issue of the distinctiveness of the trade dress in issue, a factor which requires us to attempt to assess the type or strength of the purported mark. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1185 (7th Cir.1989); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir.1986). This issue is closely related to the issue of secondary meaning, and it is an issue as to which this court views Eldon's case as having significant problems. The Eldon trays and sorter, from the evidence presented to this court, appear to combine common, simple elements in a very pleasing form. The problem, however, is that the elements are common, and nothing about any one of them or their overall configuration suggests that the design functions as a trademark. If a trademark is present in Eldon's designs, it is, in this court's judgment, a very weak mark, which may or may not have become associated with Eldon over time for secondary meaning purposes, but which cannot, standing alone, be found to be distinctive.

The court turns next to the issue of Rubbermaid's intent. The evidence showed that as of 1973, Rubbermaid was selling SnapStack letter trays which did not have ribs and bore virtually no resemblance to the products in dispute (PX Rubbermaid 4 at 6). By 1976, Rubbermaid had redesigned the original SnapStack, again in a manner unlike the products at issue here (PX QuickStack 9; Tr. 619–620). Rubbermaid added a legal size tray to this line in 1978. Although Rubbermaid was selling a substantial volume of its products, it lagged behind Eldon, estimating that Eldon controlled 87% of the tray market where it, Rubbermaid, controlled only 6% (PX QuickStack 4). In this context, Rubbermaid designed the QuickStack tray at issue here.

It is uncontested that the designer of the QuickStack tray took design measurements from the Eldon Stackable (Tr. 677–678). Rubbermaid adopted the same four-size product line used by Eldon (PX QuickStack 4). Besides designing its trays to look similar to the Eldon trays, Rubbermaid decided to make its tray interstack with the Eldon tray, rather than with the Rubbermaid trays already on the market (PX QuickStack 1; Tr. 585). Rubbermaid chose colors similar to Eldon's (PX QuickStack 2, 5). Rubbermaid's legal department was requested to furnish an opinion concerning possible design patent infringement vis-a-vis the Eldon product (PX QuickStack 3).

Rubbermaid also introduced a modular vertical file in the 1970's called the Snap File (PX Rubbermaid 6). This file had no ribs and was dissimilar to the Eldon Add–A–File in appearance. (PX QuickSnap 14). In 1983, however, Rubbermaid decided to design a vertical file compatible with its redesigned letter tray (PX QuickSnap 1). Rubbermaid documents referred to the redesign project as creating "a vertical sorter similar to the Eldon Add–A–File . . . ." (PX QuickSnap 2). Rubbermaid Staff Designer Robert Jourdian took and used the dimen-

sions and shape of the Add–A–File in designing the QuickSnap (Dep. of Jourdian at 125). Jourdian referred to the new QuickSnap as the "RCP version of the Eldon 'Add–A–File'" (PX QuickSnap 6). Mike Szablak, Senior Designer for the QuickSnap project, referred to the QuickSnap as "our Eldon Add–A–File knockoff" (PX QuickSnap 7). Rubbermaid's own documents make clear that its designers intended these products to be interconnectable with Eldon's products and to be similar to Eldon's products in appearance (PX QuickSnap 1 at 2; PX QuickStack 1 at 1). There can be no contention, therefore, that the similarity of these products is an accident. Rubbermaid wanted them to look like, work like and work with Eldon's competing products. The evidence of intentional copying is clear.[18]

The next issue which must be addressed as part of the likelihood of confusion analysis is evidence of actual confusion. Besides Mr. Falls' inability to distinguish between the parties' vertical files based on a quick glance during the hearing, Eldon has offered only evidence that a local wholesaler gives Rubbermaid's QuickSnap the stock designation "Add–A–File" (Aff. of Clemens). There was no evidence, however, that the wholesaler was confused as to the product's source; indeed, Rubbermaid submitted an affidavit of the Warehouse Club's assistant buyer indicating that the Warehouse Club used the term "add-a-file" as a generic term and never believed that it was selling anything other than a Rubbermaid product (Aff. of Daly). Eldon also claims that evidence that its sales declined demonstrates actual confusion, but it does not; there are many possible explanations for a decline in sales, and even if Rubbermaid's sales increased in proportion to Eldon's decline, this may mean only that consumers have knowingly chosen to buy from Rubbermaid. There was, therefore, no evidence of actual consumer confusion, and

---

18. The court recognizes that product designers frequently study competing products in the course of new product design. For example, Mel Evenson and other members of Eldon's New Product Development Committee reviewed McDonald, Rubbermaid, Glassform, Smith Metal Arts and Sterling Plastics trays when planning the design for the Image 1500 line (DX 4–5). *Studying one's competitors' products to come up with a better one is one thing. Designing a new product to look like a competitor's established one is something else entirely.*

indeed, this court believes, for reasons described below, that actual confusion in the marketplace is very unlikely.

While some of the above-described factors favor Eldon and some favor Rubbermaid, the court finds the likelihood of actual confusion in this case to be remote. Both Rubbermaid and Eldon make most of their sales through office products catalogues. The Rubbermaid and Eldon names and logos are prominently displayed in the catalogue advertisements, and each product is associated clearly with its manufacturer. Both companies' products come clearly labelled with large colorful and distinctive labels with the manufacturer's name boldly displayed. No buyer could possibly confuse the source of the product he was buying. *See Interpart Corp. v. Italia,* 777 F.2d 678, 683–684 (Fed.Cir. 1985).

The Lanham Act, however, is not intended only to prevent confusion at the time of sale, but applies to potential post-sale confusion as well. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 873 (2d Cir.1986). In the post-sale context, the parties' labels will have been discarded and will be of no help in avoiding confusion. Of course, even after the products are removed from their packaging, close examination reveals differences in shape, color and weight, and most of the products have the manufacturer's name or logo embossed on the bottom, visible when the products are handled, although not visible when they are in use. *See generally Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 121 [59 S.Ct. 109, 114, 83 L.Ed. 73] (1938).

The fact that Rubbermaid's products are clearly and distinctively labelled at the time of sale, as well as in the catalogues in which they are offered for sale, and the fact that they are readily differentiable from Eldon's on close examination, all tend to negate, but cannot entirely eliminate, the possibility of confusion. Accordingly, the court concludes that it is unlikely, but not impossible, that Eldon will be able to establish a possibility of consumer confusion at trial. However, any showing of

confusion Eldon can make will likely be limited to the post-sale context.

3. Functionality

The court next addresses the issue of whether Rubbermaid has undermined Eldon's claims with evidence that Eldon's designs are "functional." As stated above, trade dress that is functional is not entitled to the protection of the Lanham Act. In determining whether a given trade dress is functional, the court must consider the design as a whole, rather than its individual features. *Vaughan Mfg., supra* at 350.

Rubbermaid's functionality arguments fall into two categories. First, it argues that Eldon's cored rib design is functional in that it is "'superior or optimal in terms of engineering, economy of manufacture, [and] accommodation of utilitarian function or performance.'" *Vaughan Mfg., supra* at 350, *quoting Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 429 (5th Cir.1984). Second, Rubbermaid argues that it had to design its products to look similar to Eldon's so that its products could interconnect with and be visually compatible with Eldon's. Rubbermaid contends that adopting design features similar to Eldon's was necessary for effective competition.

Rubbermaid introduced evidence that the cored rib design reduces the material necessary to make the tray or sorter, provides strength relative to the amount of material used, provides for a logical flowpath for the plastic material during the injection molding process and permits visual access so that the user can see whether anything is in the tray without actually looking inside (Tr. 338–339, 374–376, 638–640). Rubbermaid's witnesses testified that as a result of adopting the cored rib design, the QuickStack was less costly to produce than the SnapStack and the QuickSnap was less expensive to produce than the Snap File (Tr. 470, 473–474).

It is obvious that a cored design requires somewhat less material than a solid design in a product of comparable dimensions, and that if materials of equal cost are used, a cored design will likely result in

some cost savings; however, it is unclear how significant these savings are.[19] But the fact that Eldon's cored design uses less material than Rubbermaid's earlier solid design hardly establishes that other design configurations could not be developed using less material than Rubbermaid's earlier designs. Similarly, the argument that vertical ribs provide strength relative to holes or horizontal ribs fails to negate the existence of other adequately strong design configurations. A brief perusal of the office products catalogues introduced into evidence makes clear that there are numerous workable design alternatives. The argument that Eldon's cored rib design provides for an efficient material flow, suggesting that the design is relatively simple to mold, establishes only that Eldon has developed a practical, workable design; it does not mean that other designs cannot also be efficiently molded. Finally, with respect to visual access, the court finds this argument creative but unavailing. Virtually all stacking letter trays provide visual access from the front and many from the back. Rubbermaid's prior design provided easy visual access because its trays were raised a distance above each other with stacking supports. Visual access, if desired, can be achieved through the use of transparent or translucent materials or by cut-outs other than cored ribs. Furthermore, there was no persuasive evidence that visual access is a quality a manufacturer of desk trays or modular vertical sorters needs to utilize in order to compete effectively. There are many competitive products in the marketplace that offer no visual access to documents, including Eldon's and Rubbermaid's top quality lines. Rubbermaid proved that Eldon's design is a good one. It did not prove that other designs are not equally competitive.

The second thrust of Rubbermaid's functionality argument is that in order to compete effectively, its products had to interlock with Eldon's and be "visually compatible" with them.

The Seventh Circuit made clear what it thought of this argument, at least with respect to inexpensive, plastic letter trays, in *W.T. Rogers & Co., Inc. v. Keene,* 778 F.2d 334, 343–345 (7th Cir.1985). There, plaintiff Rogers manufactured a plastic, stacking letter tray with hexagonal end panels. Keene began manufacturing a tray modeled after Rogers', arguing that "the decor compatibility of stacked trays requires that any manufacturer of such trays be allowed to use the same shaped end panel as any other" since a stack of non-conforming trays would be ugly; accordingly, a junior entrant should be permitted to make his trays compatible with more senior market participants' products. *W.T. Rogers, supra,* 778 F.2d at 343. The Seventh Circuit rejected this argument for a number of reasons. It noted that plastic stacking trays are cheap items and can easily be replaced if a more attractive design comes along, as evidenced by Rogers' success with its novel hexagonal design. It further observed that the market for such desk accessories is constantly expanding as products wear out, new companies are formed and new offices are built. But the most important problem with the "decor compatibility" argument, the Seventh Circuit noted, "is that it is an open Sesame to trademark infringement." *Id.* at 344. If "decor compatibility" were accepted as a type of functionality, then any manufacturer would be free to copy any other manufacturer's goods, regardless of the senior manufacturer's trademark rights in his product. *Id.*

The issue of functionality comes down to the issue of whether a given design configuration is "intrinsic" to the product in question. *Id.* at 339. Put another way, is the Eldon design configuration, including its dominant cored ribs, a feature likely to be found in most letter trays even if no manufacturer wished to have its product confused with another's product? The answer, as this court sees it, is plainly no. The market is full of alternative designs, and more can easily be imagined. While the court is cognizant of the fact that El-

---

**19.** As Eldon's Herbert Rome pointed out, just because one product uses less plastic than an-

other does not mean it costs less to manufacture (Tr. 23).

don has captured a substantial proportion of the market with its Stackable and Add–A–File, and that that evidence suggests that there is something very appealing about the Eldon design relative to its competitors' designs, that does not make its design functional. Rather, what it suggests is that the low-priced desk accessory market responds to good design. There is no reason to believe that Eldon has come close to exhausting the possibilities for good design.

Rubbermaid has provided the court with no basis for concluding that it could not compete with another design, and therefore, it appears that Eldon is not likely to be defeated at trial by Rubbermaid's functionality defense.

### B. Eldon's Trade Dress Contentions Regarding Its Image 1500 Line

Eldon's Mel Evenson began to design the Image 1500 line in 1978, reviewing the existing products sold by companies such as McDonald, Smith Metal Arts, and Smokador when planning his design. Sales of the Image 1500 line were first made in 1979. This line contains three products which are currently at issue: a letter size tray, a legal size tray, and stacking supports. The trays have partially closed front ends and soft, rounded edges and corners. The trays can be used singly or with additional trays connected by the use of four stacking supports. The Image 1500 stacking support also has a "soft" look. Eldon never sought a design patent on any feature of the Image 1500 line.

Eldon has incorporated the soft look of the Image 1500 line into other accessories, including a memo holder and a calendar holder. It has also extended the look into a line of wood accessories, the Woodline 6500 line; a line of metal accessories, the Emphasis 6000 line; as well as into its Leather 3500 line.

Eldon contends that its Image 1500 line has timely attained secondary meaning, that is, that the consuming public associated the line's soft look with Eldon prior to the 1986 introduction of the Rubbermaid Form 1000 line. Eldon argues that its sales of more than 1,500,000 Image 1500 trays since 1979 and of more than 1,500,000 sets of stacking supports since 1978 are indicative of secondary meaning. Eldon points further to its advertising expenditures and the advertising of the line in various office products catalogues as indicative of secondary meaning. Eldon also contends that its extension of the soft look into more expensive accessories such as the Emphasis 6000 and Woodline 6500 lines establishes secondary meaning.

Rubbermaid, on the other hand, contends that the Image 1500 line never attained secondary meaning. Rubbermaid argues that the soft look of the Image 1500 line is visually similar to that of the McDonald Duk-it, Smith Metal Arts and Smokador trays, and that Evenson copied the McDonald tray's look. According to Rubbermaid, Eldon has not enjoyed exclusive use of rounded corners and partially closed front ends, and that the rectangular look achieved when the Image 1500 risers are used is very similar to the look achieved when the McDonald Duk-it trays are used with risers. In addition, Rubbermaid argues that sales of its Classic Form 1000 line, another soft look line introduced concurrently with Eldon's Image 1500 line, defeats Eldon's claim of secondary meaning.

Rubbermaid states that sales of the Woodline 6500, Emphasis 6000 and Leather 3500 lines are irrelevant to a consideration of secondary meaning because they were introduced in 1984 and 1985 and because sales have been minimal. Rubbermaid further contends that Eldon has failed to establish the extent of its advertising and has failed to demonstrate what portion of its overall advertising expenses relate to the Image 1500 line. Finally, Rubbermaid observes that Eldon has offered neither consumer surveys nor consumer testimony to establish secondary meaning in the Image's soft, radiused look.

In reply, Eldon contends that Evenson did not copy the McDonald Duk-it tray; a comparison with an Image 1500 tray shows obvious differences. Eldon further argues that it did enjoy exclusive use of the soft

features and partially closed front end embodied in the Image 1500 line, stating that a comparison with the McDonald, Smith Metal Arts and Smokador trays reveals this. Finally, Eldon argues that it is its trade dress which induces consumers to purchase Image 1500 accessories because in its advertisements, the design features of the line are prominently displayed while the Eldon name appears in small typeface.

The evidence indicates that Evenson reviewed the McDonald Duk-it (PX Evenson 3) when designing the Image 1500 line. The McDonald tray has a partially closed front and rounded edges. The corners of the bottom of the McDonald tray are nearly rectangular but nevertheless softened in appearance. The McDonald trays use four stacking supports, each of which fits into two grooves located in the tray's side walls. A tray placed on top of the supports simply rests upon them.

At a New Product Development Committee meeting held in January 1978, Evenson presented his reworking of the McDonald tray. Evenson lowered the tray's bottom and reduced the opening at the front of the tray (DX 5). At a similar meeting held in April 1978, the committee, including Evenson, Glen Church and Herbert Rome reviewed McDonald, Rubbermaid, Glassform, Smith Metal Arts and Sterling Plastics trays (DX 4). The Smith Metal Arts tray has a partially closed front end, but it is much more closed than that of the McDonald Duk-it tray (PX Evenson 1; DX 24). Evenson testified that he also reviewed the Smokador tray (PX Evenson 2). This tray also has a partially closed front end and rounded edges and corners.

The Rubbermaid Classic Form 1000 line was being sold concurrently with the Image 1500 line. The Classic Form 1000 trays have completely open front ends with rounded edges and corners (PX Form 1000 24a). The stacking supports for the Classic Form 1000 trays are C-shaped and noticeably distinguishable in size, shape, and manner of use from those associated with any of the other trays offered into evidence (PX Form 1000 24b).

The evidence also shows that various other companies manufacture and sell soft look plastic stacking trays. These include Business Accessories, Inc. (DX 25 at 9) and Globe–Weis (DX 26). In addition, other companies utilize a soft look in trays composed of more expensive materials such as wood and metal. These include Metcor's 3000 Series (DX 30 at 22–29), BPC Industries Basics (DX 29), and Polar Manufacturing Company's 100 Treasure Series (DX 28 at 3) and 2800 Collection Desk Accessories (DX 28 at 12).

Eldon spent approximately $6 million on advertising for all of its products between 1973 and 1984. Approximately $1,200,000 was spent in 1984 and again in 1985 (Tr. 97). In addition, promotional advertising expenses, for all of Eldon's products, were approximately $2,000,000 in 1986 (Tr. 97–98). Eldon currently spends more advertising the Image 1500 line than it did when the line was introduced (Tr. 173).

With respect to sales, prior to the introduction of the Form 1000 line, Eldon had sold over [sealed] sets of Image 1500 stacking supports, approximately [sealed] letter size trays, and approximately [sealed] legal size trays (PX Eldon 7). The evidence shows that sales of the letter size trays dropped by approximately [sealed] units in 1986 compared with the preceding year.

■ Eldon's secondary meaning evidence as to the Image 1500 is considerably weaker than its evidence concerning the Stackable and the Add–A–File. The soft, radiused look featured in the Image trays was utilized to varying degrees by numerous other manufacturers prior to the Image 1500's entry into the market. It is true, at least to this court's eye, that the Image tray, because of subtle variations in the shaping of its radiused features, has an aesthetic appeal, a gracefulness and elegance, which, when viewed side-by-side with competitive trays, gives it some distinction. It is also true that to a significant extent, Rubbermaid adopted in its Form 1000 tray the subtle design features that distinguish the Eldon tray from its competition. But to show secondary meaning, Eldon would have to establish that consumers

associated the Image design with a single producer, not merely that given a choice between competing trays, more people would choose Eldon's product. As the Seventh Circuit said in *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 343 (7th Cir.1985), speaking of W.T. Rogers' successful hexagonal-sided letter tray:

> ... [S]uppose the only thing the hexagonal end panel does is enhance the attractiveness of the tray; suppose it has no more to do with marking the tray as a product of Rogers than the characteristic silhouette of a station wagon marks it as a product of General Motors. Rogers would deserve a reward for hitting on a pleasing design which competitors were quick to copy but it would have to seek that reward under the design-patent law rather than the trademark law.

There is nothing in the record which suggests that consumers seeing the Eldon Image design view it as a source identifier. There is no evidence that its features are sufficiently distinguishable from those of its competition to create the association with a particular producer that is essential to secondary meaning. While there are subtle differences in the way Eldon has configured its design, the elements of its design are common in the marketplace and the configuration of those elements is similar to that found in many other trays. On these facts, there is no basis for finding secondary meaning. Accordingly, Eldon cannot show that its Image 1500 line is protected by the Lanham Act.

## II. *Irreparable Injury*

 "[D]amages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 858 (7th Cir.1982). The courts' "readiness to find irreparable injury arises, in part, from the realization 'that the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods.'" *Ideal Industries, Inc. v. GardnerBender*, 612 F.2d 1018, 1026 (7th Cir.

1979), *cert. denied*, 447 U.S. 924 [100 S.Ct. 3016, 65 L.Ed.2d 1116] (1980), *quoting* 4 Callman, *Unfair Competition, Trademarks and Monopolies* § 88.3(b) at 205 (3d ed. 1970). It is irrelevant whether the infringer's goods are of an inferior or superior quality when compared with those of the plaintiff. *Wesley–Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir.1983). On the other hand, any sales that Eldon loses to Rubbermaid will be compensable in damages if Eldon prevails at trial, making lost sales an insignificant factor here, particularly in view of the fact that Eldon has not contended that Rubbermaid's conduct is threatening its financial stability or threatening to put it out of business.

In this case, Eldon's problems are arguably aggravated beyond those usually encountered because Rubbermaid has designed its products to interconnect with those of Eldon, and Eldon has no control over the fit between its products and those of Rubbermaid. A poor fit between an Add–A–File and a QuickSnap, or a Stackable and a QuickStack, could reflect poorly on Eldon, or could cause the consumer to lose patience with the product, regardless of whom he/she believed the manufacturer to be. On the other hand, because the products are clearly labeled when sold, and because a consumer attempting to interlock them would be in a position to observe the differences in color, shape, design and material that do exist and would in all likelihood observe the manufacturer's name on the product's underside, the likelihood of Eldon's reputation and good will being compromised is considerably reduced.

Rubbermaid argues that Eldon's delay in seeking injunctive relief undermines Eldon's contention that it will be irreparably injured if a preliminary injunction is not granted. A party's delay in moving for a preliminary injunction is relevant to assessing the probability of irreparable injury. *Ideal Industries, supra* at 1025. Eldon first became aware of the QuickStack in 1983 and the QuickSnap in 1985, yet did not file suit until 1987 and failed to move for preliminary injunctive relief until 6½

months after suit was filed. Eldon responds that it attempted to stop Rubbermaid's infringement through informal means and that its failure to file suit earlier was due to its size relative to Rubbermaid's and its concern about its ability to sustain the costs of litigation. It contends that it sued only when it became clear that there was no other way to stop Rubbermaid from copying every successful Eldon product.

While this court has no difficulty concluding that to the extent consumers are confused, Eldon faces irreparable injury if Rubbermaid is not enjoined, it has found the likelihood of confusion to be minimal. As was noted earlier, significant consumer confusion is very unlikely, and while the court can readily understand why Eldon's cost-benefit analysis counseled it to delay suit, the fact of that delay nevertheless demonstrates that Eldon was not being hurt beyond its capacity to cope. Had Eldon been experiencing severe, irreparable injury, it is reasonable to conclude that its cost-benefit analysis would have led it to court earlier.

In sum, the court concludes that if its motion is not granted, Eldon will suffer irreparable injury to the extent of consumer confusion, but that because of the unlikelihood of confusion, Eldon is unlikely to suffer significant injury that cannot be compensated in damages.

III. *Balance of Harms*

Besides the irreparable injury Eldon claims it will suffer if its motion is not granted, Eldon contends that Rubbermaid's infringing activity has resulted in a decline of sales of the products in issue or a flattening of its sales curve. Eldon further argues that every sale Rubbermaid makes is a sale Eldon does not make.

Rubbermaid responds that Eldon sales did not decline after Rubbermaid's products entered the market, nor did its sales curve flatten. Rather, Rubbermaid contends, Eldon's sales *increased;* for example, sales of the letter size Stackable rose in both 1983 and 1984. Rubbermaid further contends that Eldon has offered no

evidence showing a causal connection between any sales decline Eldon claims to have experienced and Rubbermaid's conduct.

With respect to the sorters at issue, Rubbermaid's QuickSnap sales increased from [sealed] in 1985 to [sealed] in 1986. Eldon's 1985 Add–A–File sales totaled [sealed] units and declined to [sealed] in 1986. Hence, Eldon lost approximately half the number of sales that Rubbermaid gained.

From its introduction in 1983, Rubbermaid's letter size QuickStack sales have steadily increased, rising approximately 400,000 between 1983 and 1984, 200,000 between 1984 and 1985, and 300,000 between 1985 and 1986. Eldon's sales have increased during this period as well, although the extent of the increase has declined each year over the 1983–1986 period. Nevertheless, in 1986, Eldon sold four times as many letter size stacking letter trays as Rubbermaid did, with [sealed] sales compared to Rubbermaid's [sealed]. It should be noted that between 1981 and 1982, prior to the appearance of Rubbermaid's QuickStack, Eldon's letter size Stackable sales decreased by 100,000 units.

Eldon's sales of legal Stackables declined from [sealed] to [sealed] between 1981 and 1982. Rubbermaid's sales have increased steadily and substantially since the product's introduction in 1983, while Eldon's sales, after a jump between 1983 and 1984, have remained fairly constant. Currently, Eldon sells approximately four times the number of these units annually that Rubbermaid sells.

The figures for sales of the EDP QuickStack and Stackable indicate that Rubbermaid's sales have steadily increased from [sealed] in 1983 to [sealed] in 1986, while Eldon's, after a modest rise between 1983 and 1984, have modestly declined from [sealed] in 1983 to [sealed] in 1986.

Since it is fairly clear that Eldon and Rubbermaid are competing for the same buyers, it stands to reason that the entry of Rubbermaid, or any other market participant with a competitive product, could be

expected to have some impact on Eldon's sales. Nevertheless, the evidence is insufficient to permit the conclusion that Rubbermaid's products *caused* Eldon's loss. It should be noted in addition that Eldon, at least as of the 1986 figures the court was provided, continues to hold an extremely strong market position and to enjoy significantly more sales than Rubbermaid with respect to both products.

Turning to Rubbermaid's potential harm if enjoined, it appears that the injury Rubbermaid will suffer if it is enjoined is significant. Rubbermaid has been marketing the QuickStack since 1983 and the QuickSnap since 1985. Although clearly on notice during this time that Eldon believed it was guilty of infringement, Rubbermaid has built its market for six years in the case of the QuickStack and four in the case of the QuickSnap. It has advertised and promoted; it has established itself in offices and has created a demand for its product. During this time Eldon could have brought suit but did not.

Rubbermaid contends that if production and sales of its products are enjoined, it will suffer approximately [sealed] in lost sales the first year the injunction is in effect, and at least that amount annually thereafter. Rubbermaid attributes these losses as follows: the QuickStack line, [sealed]; the QuickSnap, [sealed]; and the Form 1000 products in issue, [sealed]. It further argues that if production and sales are enjoined, it will lose credibility in the marketplace to such a great extent that its reputation will be injured beyond repair. Eldon responds that Rubbermaid abruptly discontinued production and sale of its SnapStack line without concern about loss of credibility and reputation. To this the court notes that SnapStack sales were in marked decline at the time the line was discontinued. It is one thing to discontinue a product of declining popularity and another to discontinue a successful and increasingly successful one. The harm to Rubbermaid's reputation and credibility that will flow from being compelled abruptly to discontinue sales of two popular products should not be minimized.

Rubbermaid also introduced evidence of the costs it would incur if an injunction compelled it to redesign the QuickStack and QuickSnap. Rubbermaid estimates that it would take [sealed] per product or product line to develop accessories to replace those Eldon has challenged. Designing three new lines, according to Rubbermaid's Frederick Rentz, would cost nearly [sealed]. In addition, new molds would have to be created. He estimated the approximate cost of new molds as follows: the QuickStack line, [sealed]; the QuickSnap, [sealed]; and the Form 1000 products in issue, [sealed] (Aff. of Rentz at ¶¶ 13–14).

Eldon does not dispute that an injunction would force Rubbermaid to incur delay, design cost and start-up manufacturing costs, but it argues that Rubbermaid's cost estimates are too high. Eldon maintains first, that Rubbermaid would not have to design new molds, but would merely have to alter its current molds to achieve a design configuration less similar to Eldon's. Eldon's Herbert Rome estimates that new "slides" to create different side panels for the QuickStack would cost $15,000 a pair. While the evidence did not demonstrate precisely how the molding process works, we assume Mr. Rome means that Rubbermaid could modify its [sealed] mold cavities at a cost of $165,000. With respect to the QuickSnap, Mr. Rome's estimate for the cost of modifications is $25,000 per cavity; Rubbermaid employs [sealed] for a total of [sealed].

The evidence on this subject was incomplete. It is not possible on this record to determine exactly what costs Rubbermaid would incur in redesigning its products; presumably the cost to a great extent would depend on the nature and extent of the redesign. It is possible to say, however, that the injury to Rubbermaid if enjoined, in terms of lost sales, redesign costs and injury to good will and reputation, would be, while not crippling, substantial. It should further be observed that a significant part of Rubbermaid's potential injury, particularly with respect to loss of good will, would be directly attributable to Eldon's delay in seeking injunctive relief.

## IV. *The Public Interest*

It is well-established that one of the primary purposes in enacting the Lanham Act was to ensure that consumers are not deceived as to the source of goods purchased. *See, e.g., Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987); *G. Heileman Brewing Co., Inc. v. Anheuser–Busch, Inc.,* 676 F.Supp. 1436, 1484 (E.D.Wis.1987), *aff'd,* 873 F.2d 985 (7th Cir.1989). While the court cannot rule out the possibility that some consumers may be confused by the products' similarity in the post-sale context, it views that possibility as modest. While the entry of a preliminary injunction would ensure that no consumers are confused, the likelihood of actual confusion is so minimal that this court does not believe that the public interest demands injunctive relief here.

### CONCLUSION

Based upon the court's conclusion that Eldon is unlikely to prevail at trial in establishing that its Image 1500 line acquired secondary meaning and given the weakness of Eldon's evidence of secondary meaning with respect to its Stackable and Add–A–File lines, the issues of irreparable injury and the parties' respective harms take on great significance. Because of the unlikelihood of significant consumer confusion concerning these products, the court finds Eldon's potential injury to be modest, except with respect to potential lost sales, an injury compensable in damages. On the other hand, an injunction will cause Rubbermaid to suffer significant injury.

Weighing these factors, the court concludes that Eldon has not succeeded in establishing the propriety of the extraordinary remedy of a preliminary injunction. It is therefore recommended that Eldon's Motion for a Preliminary Injunction be denied.

Counsel are given ten days from the date hereof to file exceptions to this Report and Recommendation with the Honorable Ilana Diamond Rovner.

Respectfully submitted,

(s) Joan B. Gottschall
JOAN B. GOTTSCHALL
United States Magistrate

DATED: July 5, 1989.

### APPENDIX B

REPORT AND RECOMMENDATION RESPECTING RUBBERMAID'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE ILANA DIAMOND ROVNER, one of the Judges of the United States District Court for the Northern District of Illinois.

Presently before the court is the motion of defendants Rubbermaid, Inc., and Rubbermaid Commercial Products, Inc. (referred to collectively as "Rubbermaid" except where explicitly distinguished) for partial summary judgment.[1]

Plaintiff and defendants produce and sell, among other items, low-cost plastic stacking desk trays and vertical files. Plaintiff Eldon Industries, Inc. ("Eldon") produces and sells a line of stacking desk trays called Stackables and a sorter called the Add–A–File utilizing a cored rib configuration.[2] Rubbermaid, after Eldon's introduction of its accessories, began to manufacture and sell trays called QuickStacks and a sorter called the QuickSnap using a similar design. The design configurations of the Eldon products are registered on the Patent and Trademark Office's Supplemental Register.

Eldon filed a six-count complaint against defendants, four of which counts are pertinent here. In Counts I and II, Eldon alleges that Rubbermaid's production and sales of its QuickStack and the QuickSnap lines infringe Eldon's registered trademark rights in the trade dress of its Stackable line and the Add–A–File, respectively, in

---

1. All citations to the record and exhibits herein refer to the preliminary injunction hearing held by this court.

2. Coring is a process in which spaces are punched through the plastic side walls of a product, in this instance, creating ribs (Tr. 481–482).

violation of § 32 of the Lanham Act, 15 U.S.C. § 1114.[3] In Counts III and IV, Eldon alleges that the same activity constitutes unfair competition in violation of the Lanham Act § 43a [43(a)], 15 U.S.C. § 1125(a).[4]

Defendant Rubbermaid Commercial then filed a counterclaim. In it, Rubbermaid Commercial claims that the supplemental registrations procured by Eldon on the Stackable tray line and the Add–A–File should be cancelled based on Eldon's failure to meet the requisite exclusive use period of one year with respect to both the Add–A–File and the Stackable.

Defendants have moved for partial summary judgment on Counts I–IV of Eldon's Complaint, and on Rubbermaid Commercial's counterclaim for cancellation of the supplemental registrations. According to defendants, the two counts premised on infringement must be dismissed if the supplemental registrations are cancelled because registration is a prerequisite to a § 1114 claim. Defendants contend that the other two counts based on unfair competition must be dismissed because the Eldon products failed to timely attain the secondary meaning essential to its claim under § 1125.

For the reasons set forth below, this court recommends that defendants' motion be granted in part and denied in part.

### I. Summary Judgment Procedure

The entry of summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate where the movant can "show that there is no genuine issue to any material fact and that [he] is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). *Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 841 F.2d 1347, 1352 (7th Cir.), *cert. dismissed*, [—— U.S. ——] 109 S.Ct. 1 [101 L.Ed.2d 953] (1988); *Weimerslage v. United States*, 838 F.2d 899, 902 (7th Cir.1988). Rule 56(e) requires a non-moving party who will bear the burden of proof on an issue at trial to demonstrate affirmatively that there is a genuine issue of material fact necessitating a trial. *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 938 (7th Cir.1989). The entry of summary judgment is appropriate where a party fails adequately to demonstrate the existence of all essential elements on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 [106 S.Ct. 2548, 2552, 91 L.Ed.2d 265] (1986).

Partial summary judgment may be appropriate in particular cases. *See American Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 729 (7th Cir.1986). The same standards regarding submissions and the determination of whether disputed issues of material fact exist which apply to "full" summary judgment apply. *See Bailey v.*

---

**3.** Under the Lanham Act § 32(1), 15 U.S.C. § 1114(1), a person may be liable in a civil action where, without consent of a trademark registrant, that person shall:

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

**4.** Lanham Act § 43a [43(a)], 15 U.S.C. § 1125(a) provides in pertinent part:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

*ITT Grinnell Corp.*, 536 F.Supp. 84, 88–89 (N.D.Ohio 1982). The court is to determine whether granting partial judgment will expedite the litigation. *Federal Deposit Ins. Corp. v. Elefant*, 790 F.2d 661, 665 (7th Cir.1986).

## II. *Statement of Facts*

### A. *The Eldon Stackable Line*

Eldon is a Delaware corporation whose business includes the design, manufacture and sale of office accessories. It began to design its 1600 "Stackable" tray line in the late 1960's. The first unit in that line designed and manufactured was the plastic 1600 letter size stackable tray, a side-loading tray with a vertical cored rib design extending approximately two-thirds of the length of the tray's side walls. The remaining third of each wall contains a hand-hole. The line was first sold in approximately 1968, and is currently advertised and sold in the marketplace.

Eldon received design patent No. 220,014 on the configuration of its Stackable tray from the Patent and Trademark Office ("PTO").[5] The patent was valid February 28, 1971 until February 20, 1985.

Eldon subsequently added three trays with similar cored rib configurations to its 1600 line. These were the 1604 Super Stackable Tray (for data processing papers and binders), produced in the early 1970's; the 1602 Legal Size Stackable Tray, produc-ed in the late 1970's; and the 1607 Front-Loading Stackable Tray, also produced in the late 1970's.

On January 6, 1986, after its patent had expired, Eldon applied for registration of the design configuration of its Stackable line on the Trademark Principal Register. Eldon claimed a date of first use[6] of June 23, 1969, and of first use in commerce[7] of July 11, 1969. The PTO denied this application April 10, 1986, giving as its reasons that the design configuration of the tray was merely descriptive and as such lacked secondary meaning. Eldon then amended its application to one for registration on the Trademark Supplemental Register. In its amendment, Eldon stated that it was not agreeing with the position of the PTO that the configuration lacked secondary meaning, but that the conversion was a matter of expediency. It identified its design configuration as "design of desk tray," and the sketches on the application illustrated the ribbed design and the hand-holes. Eldon received Trademark Supplemental Registration No. 1,403,589 on the Stackable desk tray line July 29, 1986 (Tr. 27, 43–44, 89, 189–191, 266, 88; DX 31).

Eldon made the following sales of its Stackable trays for the years indicated (numbers are approximate):

| | 1981 | 1982 |
|------|-----------|-----------|
| 1600 | 2,600,000 | 2,500,000 |
| 1602 | 443,000 | 414,000 |
| 1603 | 327,006 | 269,352 |
| 1604 | 366,827 | 294,092 |

---

**5.** A design patent is valid for fourteen years. 35 U.S.C. §§ 171, 173. *See generally* 1 Gilson, *Trademark Practice & Procedure*, 2–106-2–108 (1989). When a design patent expires, or when a product's trade dress is not recognized as a common law trademark (that is, has not attained secondary meaning, *see infra*), the trade dress of the subject goods is considered to be in the public domain and may be freely copied on a universal basis. "Other like goods, equal to them in all respects, may be manufactured or dealt in by others, who, with equal truth, may use, and must be left free to use, the same language of description in placing their goods before the public." *Beckwith v. Commissioner of Patents*, 252 U.S. 538, 543–544 [40 S.Ct. 414, 416, 64 L.Ed. 705] (1920).

Statutes and decisional law may, however, require that manufacturers of the formerly patented product label their product so as to avoid likelihood of confusion with the former patent holder's product. *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 237–238 [84 S.Ct. 779, 781–782, 11 L.Ed.2d 669] (1964); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231–233 [84 S.Ct. 784, 788–789, 11 L.Ed.2d 661] (1964); *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119–122 [59 S.Ct. 109, 113–115, 83 L.Ed. 73] (1938).

**6.** This should be the date on which the product was first sold or transported by the applicant or for its benefit. *Trademark Manual of Examining Procedure* ["*TMEP*"], 800–13 (rev. ed. 1989).

**7.** This is the date on which the product was first sold or transported in a type of commerce which Congress may regulate. *Id.*

Rubbermaid estimated that in 1982, Eldon held 87% of the stacking desk tray market, based on Stackable sales (PX QuickStack 2, 4).

Another company, Sterling Plastics ("Sterling"), designed a stacking tray with a cored rib design and began to sell it during the time that Eldon's design patent was valid. Eldon advised Sterling that the Sterling product infringed Eldon's patent rights. Eldon and Sterling entered a settlement agreement March 1, 1976, in which Sterling agreed to stop manufacturing the ribbed tray in issue for 15 years (Tr. 205; DX 1).[8]

Keene Manufacturing, Inc. ("Keene") currently advertises and sells two letter trays which utilize a vertical cored rib design similar to the Eldon trade dress—the Universal Letter Tray and the Universal Legal Tray. Both Keene products have side walls containing vertical ribs. The hand-holes in these trays are located in the middle of the side walls, rather than toward the end of the side wall as in the Eldon product (PX C-3 at 4). No evidence was submitted as to when those products entered the market.

Eldon continued to utilize the cored ribbed design in the 1980's. During this period it manufactured and marketed a side-loading printer cart, a mobile printer cart and a note rack, all utilizing the design of the Stackable.

## B. *The Rubbermaid QuickStack Line*

The Rubbermaid defendants are similarly involved in the production and marketing of office accessories. Rubbermaid decided to produce a line of stacking trays designed to replace Eldon as the market leader. To accomplish this goal, Rubbermaid designed a line of four trays, comparable to the Eldon Stackable line and capable of interstacking with Eldon's line. These trays, called QuickStacks, did not contain hand-holes. Each had a cored rib design transversing the length of each side wall (PX QuickStack 2, 4, 7). Rubbermaid chose col-

ors for its QuickStack line which corresponded with the most popular Eldon Stackable colors. Rubbermaid telephoned various wholesalers to determine which Eldon colors were the most popular (PX QuickStack 1, 2; Dep. of Crawford at 149–150).

The Rubbermaid QuickStack line was displayed at the 1983 National Office Products Association ("NOPA") show. Rubbermaid sold QuickStack trays in 1983 and has continued to do so through the present time.

## C. *The Eldon Add–A–File*

Eldon developed its 1601 Add–A–File, a plastic vertical sorter, utilizing the cored rib design of the Stackable line. The ribbed design transverses the entire wall of the product. The rib in the center of the wall is broader than the other ribs. Eldon received design patent No. 220,633 on the configuration of the Add–A–File. It was valid May 4, 1971 through May 4, 1985.

On January 6, 1986, after its design patent had expired, Eldon applied for registration of the design configuration of the Add–A–File on the Trademark Principal Register, claiming 1969 dates of first use and in commerce. The application was denied by the PTO April 10, 1986, which determined that the design configuration of the Add–A–File was merely descriptive and as such lacked secondary meaning. On May 7, 1986, Eldon amended its application to one for registration on the Trademark Supplemental Register stating, as it did with respect to the Stackable tray, that it was not agreeing with the position taken by the PTO regarding the lack of secondary meaning, but that the conversion was merely a matter of expediency. Eldon identified its configuration as "design of file rack unit." The accompanying sketches illustrated the ribbed design of the Add–A–File. Eldon received Trademark Supplemental Registration No. 1,403,-588 on the Add–A–File's configuration July 29, 1986 (Tr. 57, 89; DX 32). Between 1979

---

**8.** There was some evidence offered regarding putative patent infringement by the Burkett Company and by a company using the "Sun" label, but that evidence does not detail the design configurations of the allegedly infringing products (Tr. 153–154, 161).

and 1985, Eldon sold over 11 million Add–A–Files.

Keene currently advertises and sells a low-cost vertical sorter which utilizes a cored rib design similar to the Eldon trade dress—the Universal Expanding File. The wall of this tray contains vertical ribs with spaces transversing its wall (PX C–3 at 4). No evidence was submitted respecting the entry of this product into the marketplace.

### D. The Rubbermaid QuickSnap

Design of the Rubbermaid QuickSnap, a low-cost plastic vertical sorter, began in 1984. A cored rib design was utilized. Unlike the Eldon Add–A–File, the QuickSnap's ribs are of uniform width throughout its wall. The QuickSnap was specifically designed to connect with the Eldon Add–A–File. The QuickSnap was displayed at the 1985 NOPA show. Rubbermaid sold QuickSnap units in 1985, and has continued to do so through the present time.

### E. Eldon's Advertising Expenses

Eldon does not record how much money is spent per product on advertising expenses (Tr. 95, 171). Between 1973 and 1984, Eldon spent approximately $6,000,000 on advertising for all of its products, not just those at issue in this lawsuit.[9] It spent approximately $1,200,000 on advertising in 1984 and again in 1985 (Tr. 97). According to Eldon's Herbert Rome, the bulk of Eldon's advertising expenses relate to the office products that are at issue in this lawsuit (Tr. 204). The advertising expenses are spread over approximately 1,100 SKUs ("Stock Keeping Units") which represent every item sold by Eldon. For example, a black Add–A–File would be one SKU, and a putty Add–A–File would be a second SKU (Tr. 171–172, 203–204). In addition, Eldon incurs promotional advertising expenses when it gives an office product dealer a discount in exchange for that dealer's agreement to advertise Eldon products at a reduced price. For 1986, promotional advertising expenses were approximately $2,000,000 (Tr. 97–98).

---

9. The products at issue in this lawsuit include three not pertinent to the instant motion—two

### III. Counts I–II: Infringement Claims; Counterclaim for Cancellation of the Supplemental Registrations

In moving for partial summary judgment, defendants claim that Eldon's Supplemental Registration Nos. 1,403,588 and 1,403,589 should be cancelled because Eldon failed to meet the required one year exclusive use period prior to applying for registration of the configurations of the Add–A–File and the Stackable. Cancellation of the supplemental registrations would require dismissal of Counts I and II, as there can be no cause of action for infringement in the absence of a registered trademark. In response, Eldon argues that its marks had attained secondary meaning prior to filing its applications to the Supplemental Register, and thus its marks were protected from unlawful infringing uses by Rubbermaid and others. Eldon further claims that because its marks timely attained secondary meaning, defendants' uses during the one year period cannot support cancellation of its registrations.

As a prelude to the court's determination on these contentions, a brief discussion of relevant aspects of federal trademark registration is helpful.

### A. Entitlement to Protection Under the Federal Trademark Laws

Title 15 U.S.C. § 1114 extends the protection of federal trademark laws to the owners of registered marks against persons whose use of the mark is likely to confuse or deceive. Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 911 (Fed. Cir.1984). Registrants on either the Principal or Supplemental Registers are entitled to institute actions based on the mark and to obtain the remedies provided in the Lanham Act. Feathercombs, Inc. v. Solo Products Corp., 306 F.2d 251, 257 (2d Cir. 1962), cert. denied, 371 U.S. 910 [83 S.Ct. 253, 9 L.Ed.2d 170] (1962).

In trademark actions, the courts have recognized that there are several different

---

Eldon Image 1500 trays and the accompanying Stacking Support.

types of marks: fanciful, arbitrary, suggestive, descriptive, and generic. *E.g.,* *Henri's Food Products Co., Inc. v. Tasty Snacks, Inc.,* 817 F.2d 1303, 1305 (7th Cir. 1987).[10] The protection afforded each type of mark is related to how closely the mark identifies the product. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 924 (10th Cir.1986). Generally, a mark which is distinctive in and of itself is entitled to registration on the Principal Trademark Register. *California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1454 (9th Cir.1985).[11]

An arbitrary mark is an everyday word or design, but one that neither describes nor suggests the product or service it identifies (*e.g.,* Black & White scotch). *Tisch Hotels v. Americana Inn, Inc.,* 350 F.2d 609, 611 n. 2 (7th Cir.1965). Fanciful (or coined) marks do not describe the product (*e.g.,* Kodak). They are devised or invented for the purpose of identifying the product or service. *Id.* A suggestive mark describes or suggests a product or service, but the consumer must use his imagination to connect the mark with the identification of the product or service (*e.g.,* Pinto automobile). *M.B.H. Enterprises v. WOKY, Inc.,* 633 F.2d 50, 54–55 (7th Cir.1980); *Tisch Hotels, supra,* 350 F.2d at 611 n. 2. *See, e.g., Application of Reynolds Metals Co.,* 480 F.2d 902, 904 (Ct.Cust.Pat.App. 1973) ("BROWN–N–BAG" suggestive of purpose to which bag may be used).

Fanciful, arbitrary and suggestive marks are all considered inherently distinctive. 1 Gilson, *Trademark Protection and Practice* 2–7 (1989). All three types of marks may be registered on the Principal Register without proof that they identify the source of the product. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 924 (10th Cir.1986). At the other end of the spectrum are generic marks. A generic mark

is the common name or design of a class of things. *Henri's Food Products, supra,* 817 F.2d at 1305. Because generic marks refer to a general class of goods and do not indicate the particular source of those goods, they may not be registered as trademarks. *Beer Nuts, supra,* 805 F.2d at 924.

A descriptive mark is one which provides information directly about or is necessary to describe goods or services (*e.g.,* Super Glue). *M.B.H. Enterprises, supra,* 633 F.2d at 54. A descriptive mark cannot be registered on the Principal Register unless it has acquired secondary meaning,[12] *i.e.,* it "has become distinctive of the applicant's goods in commerce." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194 [105 S.Ct. 658, 661, 83 L.Ed.2d 582] (1985); *Blau Plumbing v. S.O.S. Fix-it, Inc.,* 781 F.2d 604, 609 (7th Cir.1986). *See* Lanham Act § 2f [2(f)], 15 U.S.C. § 1052(f).

As mentioned earlier, Eldon was denied registration on the Principal Register, as its trade dress was determined to be descriptive. Instead of protecting that determination at that time, Eldon sought and obtained registration on the Supplemental Register, discussed below.

### B. Placement on the Supplemental Register

Marks incapable of being registered on the Principal Register may be placed on the Supplemental Register if they are "capable of distinguishing [the] applicant's goods...." Lanham Act § 23, 15 U.S.C. § 1091. Placement on the Supplemental Register creates no substantive rights in the registrant. *Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 322 [59 S.Ct. 191, 194, 83 L.Ed. 195] (1938); *Donsky v. Bandwagon, Inc.,* 193 U.S.P.Q. 336, 339 (D.Mass.1976); 1 Gilson,

---

**10.** It is not always easy to place one of these labels on a particular mark. *See, e.g., American Home Products Corp. v. Johnson Chemical Co., Inc.,* 589 F.2d 103, 106 (2d Cir.1978). In fact, during its life, a mark may fall into more than one of these categories. *Ambercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

**11.** Trademarks registered on the Principal Register enjoy a number of substantive and procedural advantages which do not accrue to registrations on the Supplemental Register. 1 Gilson, *Trademark Protection and Practice* 3–85 (1989).

**12.** *See* discussion of secondary meaning, *infra.*

*Trademark Protection and Practice* 3–87 (1989). He is not entitled to any "presumptions of validity, ownership, use or priority." *In re Federated Dept. Stores, Inc.,* 3 U.S.P.Q.2d 1541, 1543 (T.T.A.B.1987). *Accord Bivens Winchester Corp. v. Soft Brush Car Wash Systems, Inc.,* 207 U.S.P.Q. 757, 760 (E.D.Va.1980). Furthermore, the registrant is not entitled to all of the protections provided by the Lanham Act. *California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1452 (9th Cir.1985). *See* Lanham Act § 26, 15 U.S.C. § 1094 (list of Lanham Act provisions which do not apply to marks placed on the Supplemental Register).[13]

Title 15 U.S.C. § 1091 provides, concerning registration on the Supplemental Register, that the mark, if "not registrable on the principal register ... [must] have been in lawful use in commerce by the proprietor thereof, upon or in connection with any goods or services for the year preceding the filing of the application may be registered on the supplemental register...." [14] "Lawful use in commerce" for a year preceding the filing date does not simply mean a use that is not in contravention of the laws. *Ajax Hardware Corp. v. Packaging Techniques, Inc.,* 182 U.S.P.Q. 559, 561 (C.D.Cal.1974). The courts and other trademark tribunals have interpreted "lawful use" to mean **exclusive use** for the year preceding the date of application. *Automatic Washer Co. v. Easy Washing Machine Corp.,* 98 F.Supp. 445, 451 (N.D.N.Y.1951); *Kwik–Kopy Franchise Corp. v. Dimensional Lithographers, Inc.,* 173 U.S.P.Q. 378, 381 (T.T.A.B.1972); *Loctite Corp. v. National Starch & Chemical Corp.,* 516 F.Supp. 190, 212 (S.D.N.Y.1981); *Moore Business Forms, Inc. v. Continu–Forms, Inc.,* 9 U.S.P.Q.2d 1907, 1908 (T.T.A.B.1988). *See Bruce Foods Corp. v. B.F. Trappey's Sons, Inc.,* 192 U.S.P.Q. 725, 728 (T.T.A.B.1976) (departure from "exclusive use" interpretation unwarranted).

The exclusive use requirement may be defeated by a showing that the challenger or a third party used the mark in a *"prominent, descriptive* manner." *Moore Business Forms, supra,* 9 U.S.P.Q.2d at 1909 (emphasis in original). The challenger must show that there existed a "colorable imitation" of the registered mark in "continuous use," that use falling within the one year period.[15] *See Automatic Washer Co. v. Easy Washing Machine Corp.,* 98 F.Supp. 445, 451–452 (N.D.N.Y.1951).

The commencement of the exclusive one year period is the date exactly one year prior to the date of application for registration. If the applicant originally applies for registration on the Principal Register but subsequently converts his application to one for registration on the Supplemental

**13.** This does not mean that supplemental registration is without advantages. "Indeed, the principal advantage of [supplemental] registration ... is to confer federal jurisdiction on the federal courts for enforcement of the mark." *California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1454–1455 n. 2 (9th Cir.1985), *citing* 1 McCarthy, *Trademarks and Unfair Competition* 664 (1973).

Another commentator has listed the following advantages of supplemental registration:

[Supplemental] registration gives notice of the registrant's claim of rights to anyone who searches the Patent and Trademark Office records. Such registration also establishes federal court jurisdiction in an infringement action, since there is no distinction between the two registers for this purpose. In addition, the owner of such a registration may use the statutory registration notice, such as the [registered trademark] symbol, on his products, packaging and advertising, presumably deterring infringement to some extent. A

supplemental register registration also gives a form of protection because ... it can block registration of a confusingly similar mark to a third party.

1 Gilson, *supra* at 3–88 (footnotes omitted).

**14.** Recent legislation has eliminated the requirement of use in commerce for the year preceding the filing of the application. Trademark Law Revision Act of 1988, Pub.L. No. 100–667, § 121, 102 Stat. 3935, 3942 (1988). The deletion of the one-year requirement does not affect the outcome in this case, however, as the amendment does not take effect until November 16, 1989. Trademark Law Revision Act of 1988, Pub.L. No. 100–667, § 136, 102 Stats. 3935, 3948.

**15.** In the instant matter, plaintiff has not challenged defendants' exclusive use argument on the basis that the Rubbermaid products were not "colorable imitations" of the Eldon products in issue. Rather, it bases its opposition on the existence of secondary meaning.

Register, the original application date for the Principal Register is the date determinative of the exclusive use period. *Kwik–Kopy Franchise, supra,* 173 U.S.P.Q. at 380. If, when reviewing the application, the PTO examiner concludes that the one-year period has not been met, the application should be refused. *TMEP, supra* note 7, at 1100–27.

Whether the supplemental registration of a mark was proper may be challenged in any matter concerning that mark. *See Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 322–323 [59 S.Ct. 191, 194–195, 83 L.Ed. 195] (1938); Lanham Act § 37, 15 U.S.C. § 1119. If a trademark should not have been registered on the Supplemental Register because the exclusive use requirement was not met, the court may order that its registration be cancelled. *Kwik–Kopy Franchise, supra,* 173 U.S.P.Q. at 380. *See* Lanham Act § 24, 15 U.S.C. § 1092. Since § 1114, by its very language, applies only to registered marks, the cancellation of registration would eliminate the basis for any statutory claim of trademark infringement under § 1114. *Loctite Corp. v. National Starch & Chemical Corp.,* 516 F.Supp. 190, 214 (S.D.N.Y. 1981).

### C. *Eldon's Counterclaim for Cancellation of Eldon's Registrations on the Supplemental Register*

Rubbermaid's counterclaim for cancellation of Eldon's Supplemental Registrations relies on the above-described requirement that a mark be used exclusively by the owner for one year prior to the application for Supplemental Registration. According to Rubbermaid, that requirement was not met because Rubbermaid's QuickStack and QuickSnap products were in use during the one year period preceding Eldon's application for Supplemental Registration.

Eldon responds that the exclusive use requirement never applied to its applications for Supplemental Registration because, despite the contrary determination of the PTO examiner, its design configurations had previously attained secondary meaning. Eldon has, however, proffered

no authority, and the court has found none, suggesting that if a trademark attained secondary meaning prior to the commencement of the one-year period preceding application to the Supplemental Register, the exclusive use requirement may be ignored. To the contrary, supplemental registration has been cancelled even though a product had arguably attained secondary meaning before a competitor's use during the statutory exclusive use period. *See Ajax Hardware Corp. v. Packaging Techniques, Inc.,* 182 U.S.P.Q. 559, 560 (C.D.Cal.1974).

This court concludes that the putative fact that Eldon's mark had acquired secondary meaning before registration on the Supplemental Register cannot excuse it from compliance with the statutory exclusive use requirement for Supplemental Register registration. Although this means that Eldon cannot avail itself of federal remedies for trademark infringement, it is still free to demonstrate secondary meaning in this action and to seek protection under its common law trademark rights. It has been held that Supplemental Register registration should not deprive a party of preexisting common law rights. *California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1454 (9th Cir. 1985). Taking the *California Cooler* principle one step further, Supplemental Registration should not give a party rights to which the circumstances at the time of its registration did not entitle it. Accordingly, this court concludes that plaintiff was not entitled to registration on the Supplemental Register.

### D. *Trademark Supplemental Registration No. 1,403,589 Should be Cancelled*

No genuine issue exists regarding the facts relevant to the Supplemental Registration of the Stackable. Eldon began marketing its Stackable tray in July 1969. It received design patent No. 220,014, valid for fourteen years, February 23, 1971. That patent expired February 23, 1985. After that date, the design configuration of the Stackable entered the public domain.

On January 6, 1986, Eldon applied to the Principal Register for registration of the Stackable. The required period of exclusive use was therefore January 6, 1985 to January 6, 1986. After its application was denied, Eldon, on May 7, 1986, converted its application to one for Supplemental Registration. Supplemental Registration No. 1,403,589 was approved July 29, 1986.

Rubbermaid began manufacturing and selling the QuickStack line at least as early as 1983, and continues at present to manufacture and sell QuickStack trays. The QuickStack line is similar in design, color, size and function to the Eldon Stackable line. Hence, Rubbermaid's allegedly infringing product was being marketed during the period that Eldon was statutorily required to have lawful, or exclusive, use of the ribbed design and overall appearance of the Stackable.

Assuming, as Eldon contends, that the QuickStack copies the trade dress of the Stackable, Eldon did not enjoy exclusive use of the Stackable's design and appearance from January 6, 1985 to January 6, 1986. Since Eldon did not enjoy the requisite lawful use, Supplemental Registration No. 1,403,589 is invalid and should be cancelled. Thus, the court recommends that summary judgment be entered in defendants' favor with respect to Rubbermaid Commercial's counterclaim, insofar as Supplemental Registration No. 1,403,589 is concerned. Since cancellation leaves no registered mark, the court recommends that summary judgment be granted in defendants' favor with respect to the infringement claim in Count I.

### E. Trademark Supplemental Registration No. 1,403,588 Should be Cancelled

There is no genuine issue regarding the facts pertinent to the registration of the Add–A–File. Eldon began marketing its Add–A–File in 1969. It received design patent No. 220,633, valid for fourteen years, on May 4, 1971. That patent expired May 4, 1985. After that date, the design configuration of the Add–A–File entered the public domain.

Rubbermaid displayed its allegedly infringing QuickSnap at the NOPA show in the fall of 1985, and sold a number of QuickSnap units in 1985. The QuickSnap is similar to the Eldon Add–A–File in design, color, size, and function. Eldon applied for registration on the Principal Register on January 6, 1986. The requisite lawful use period therefore commenced January 6, 1985. Thus, since Rubbermaid was marketing the QuickSnap, a colorable imitation of the Eldon Add–A–File, in the autumn of 1985, Eldon did not have exclusive use of the ribbed design configuration during the requisite time. Supplemental Registration No. 1,403,588 should accordingly be cancelled.

The entry of summary judgment in defendants' favor with respect to Rubbermaid Commercial's counterclaim regarding Supplemental Registration No. 1,403,588 is appropriate. The court further recommends that summary judgment be entered in defendants' favor with respect to Count II of the Complaint. As with the Stackable, the cancellation of the Add–A–File's registration renders plaintiff's § 1114 claim moot.

### IV. Counts III–IV: Secondary Meaning and 15 U.S.C. § 1125(a)

With respect to Counts III and IV of the Complaint, based on § 1125(a), defendants allege that neither the trade dress of the Stackable line nor that of the Add–A–File had acquired secondary meaning prior to the introduction of the competitive Rubbermaid products. Defendants' secondary meaning argument is twofold. First, defendants argue that plaintiffs have failed to establish secondary meaning, as required in an action under § 1125. Second, defendants argue that by placing its marks on the Supplemental Register, plaintiff admitted that its products had not attained secondary meaning. The court addresses each contention in turn.

### A. Establishment of Secondary Meaning

To establish a violation under § 1125(a), a plaintiff must first show that it has a

protectable trade dress, that is, that its trade dress is inherently distinctive or has attained secondary meaning. Next, the plaintiff must establish that the similarities between its product and that of a junior user are likely to confuse or deceive the public. *Keystone Camera Products Corp. v. Ansco Photo–Optical Products Corp.*, 667 F.Supp. 1221, 1225 (N.D.Ill.1987).

In defending the validity of a trade dress, the senior user must show that its trade dress is inherently distinctive or that it has acquired secondary meaning. *See, e.g., Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989) (relying on 1 McCarthy, *Trademarks and Unfair Competition* 657 (2d ed. 1984)). If a senior user establishes that its trade dress is inherently distinctive, he need not prove secondary meaning. *Vaughan Mfg. Co. v. Brikam, Int'l*, 814 F.2d 346, 348 (7th Cir.1987); *Brunswick Corp. v. Spin-it Reel Co.*, 832 F.2d 513, 517 n. 2 (10th Cir.1987); *see generally Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, 1159–1163 (N.D.Ill.1987). Eldon has not argued that its trade dresses are inherently distinctive. Instead, it argues that the design configurations of its products acquired secondary meaning before Rubbermaid began using the marks. *See California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985).

" 'Secondary meaning' is *association*, nothing more." 1 Nims, *The Law of Unfair Competition and Trademarks* 154 (1947) (emphasis in original). It is attained when the consuming public associates a particular trade dress with a particular producer. *Vaughan Mfg., supra*, 814 F.2d at 348; *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1023 (7th Cir. 1979), *cert. denied*, 447 U.S. 924 [100 S.Ct. 3016, 65 L.Ed.2d 1116] (1980) (when evaluating alleged proof of secondary meaning court should be chiefly concerned with attitudes of purchasers towards mark); *Gimix, Inc. v. J S & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir.1983). The consumer need not be aware of the producer's name, but must simply associate the trade dress with a single, though anonymous, source. *Pro-*

*cessed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 856 (7th Cir.1982); 1 Nims, *supra*, at 169. The party claiming secondary meaning must establish that its mark acquired secondary meaning before the defendant commenced the allegedly infringing use of the mark. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980); *Can Am Engineering Co. v. Henderson Glass, Inc.*, 620 F.Supp. 596, 602–603 n. 7 (E.D.Mich.1985), *aff'd*, 814 F.2d 253 (6th Cir.1987); *Calvin Klein Co. v. Farah Mfg. Co., Inc.*, 229 U.S.P.Q. 795, 800 (S.D.N.Y.1985).

In considering whether secondary meaning exists, the court may consider the length and manner of use of the trade dress in issue, the scope and manner of advertising, the volume of sales, direct consumer testimony and consumer surveys. *Gimix, Inc. v. JS & A Group, Inc., supra*, 699 F.2d at 907; *Keystone Camera Products Corp. v. Ansco Photo–Optical Products Corp.*, 667 F.Supp. 1221, 1231 (N.D.Ill. 1987). Proof of intentional copying is also probative of secondary meaning, although not conclusive. *Vaughan Mfg., supra*, 814 F.2d at 349; *Keystone Camera, supra*, 667 F.Supp. at 1231. In assessing the existence of secondary meaning, no single factor is determinative and every element need not be proved. *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985). "Each case, therefore, must be resolved by reference to the relevant factual calculus." *Id.*

The following paragraphs describe Eldon's evidence as to secondary meaning.

Prior to the introduction of the Quick-Stack, Eldon had sold over 18 million Stackables. Eldon began marketing its letter size Stackable in 1968, the EDP size in the early 1970's, and the legal and front-loading sizes later that decade. Eldon held a design patent on the Stackable line valid from 1971 through 1985. The record indicates that Eldon enjoyed exclusive use of its ribbed trade dress until approximately 1976, when Eldon learned that Sterling was manufacturing and selling a ribbed stack-

ing letter tray capable of interconnecting with the Stackable.[16]

While Eldon has spent a great deal of money on advertising expenses, it has been unable to separate the expenses attributable to a particular product or product line. Eldon advertises the Stackable in various industry catalogues and in trade publications. Despite Eldon's inability to differentiate its expenses, it is clear from reviewing the materials submitted that it has extensively advertised the Stackable.

Eldon has also utilized the ribbed design on non-stacking tray products in its 1600 line, among them, the Add–A–File, a printer stand, a printer cart, and two non-modular vertical sorters. Eldon has shown that Rubbermaid, in designing the QuickStack line, did so with the intention of emulating closely the Stackables. The QuickStacks were designed to interstack with the Stackables and to match the colors of the Stackables as closely as possible. The ribbed configuration of the Stackable line was also incorporated into the QuickStack line.

Eldon has been marketing the Add–A–File since 1969. Eldon was unable to find sales records for the Add–A–File prior to 1979. From 1979 through 1985, Eldon sold over 11 million Add–A–Files. The evidence presented shows that Eldon was the sole manufacturer of vertical files with a ribbed design for approximately fifteen years. Eldon also held a design patent on the configuration of the Add–A–File, valid 1971 through 1985.

Rubbermaid's QuickSnap was purposefully designed to look like and interconnect with the Add–A–File. While there are minor variations in the products' appearance, the evidence of copying, along with the evidence summarized above with respect to the Stackable, is probative of secondary meaning.

Eldon has introduced sufficient evidence to demonstrate that there exists a genuine issue of material fact respecting whether the Stackable and Add–A–File

trade dress timely attained secondary meaning. Rubbermaid's contention as to Eldon's decision to apply for registration on the Supplemental Register does not change this result.

### B. *Supplemental Registration: Alleged Admission of Lack of Secondary Meaning*

As discussed earlier in this report, descriptive marks may not be registered on the Principal Register in the absence of secondary meaning. Placement of a mark on the Supplemental Register means that the mark is "admittedly descriptive of [the] product but one which is capable of distinguishing [the] goods." *Evans Products Co. v. Boise Cascade Corp.*, 218 U.S.P.Q. 160, 162 (T.T.A.B.1985). When the PTO Examiner places a mark on the Supplemental Register, he states on the registration document something to the effect that "the mark is merely descriptive and as such does not have secondary meaning." *See, e.g.*, DX 31–32. Rubbermaid argues that Eldon's acquiescence in the PTO's rejection of its application for the Primary Register and its decision to seek registration on the Supplemental Register precludes a finding of secondary meaning. This court disagrees.

A number of cases in the past did state that an application for registration on the Supplemental Register should be deemed an implicit admission that the mark was merely descriptive at the time the application to the Supplemental Register was made. *See, e.g., Ajax Hardware Corp. v. Packaging Techniques, Inc.*, 182 U.S.P.Q. 559, 560 (C.D.Cal.1974); *Kwik–Kopy Franchise Corp. v. Dimensional Lithographers, Inc.*, 173 U.S.P.Q. 378, 380–381 (T.T.A.B.1972). The Ninth Circuit has held, however, that the fact of supplemental registration should not bar the registrant from establishing secondary meaning in subsequent litigation. *California Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir.1985). The *California Cooler* opinion

16. Keene currently produces a stacking tray with vertical ribs but a configuration different from that of the Stackable. The evidence does not indicate that Keene marketed this tray prior to 1983.

stated that to hold otherwise would be to conclude that a registrant on the Supplemental Register "comes away with fewer rights than it would have than if it had not sought registration at all." *Id.*

Significantly, § 124 of the Trademark Law Revision Act of 1988 codifies the holding in *California Cooler,* effective November 1989, at Lanham Act § 27, 15 U.S.C. § 1095. *See* 3 Gilson, *Trademark Protection and Practice,* SREP–37 (Spec.Supp. 1989) (Senate Report on Trademark Law Revision Act of 1988); *see also* 1 Gilson, *supra,* 3–88 (1989). Under the amendment, the owner of a supplemental registration may prove that its mark had previously acquired secondary meaning. *Id.*

This court agrees with *California Cooler* and the other cases which find that rejection of an application for Primary Registration is probative, but not conclusive, evidence of lack of secondary meaning. *See, e.g., A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 907 (7th Cir.1986). The decision maker should base its conclusion as to the existence *vel non* secondary meaning on the record as a whole. *In re Hester Industries, Inc.,* 230 U.S.P.Q. 797, 798 (T.T.A.B.1986).

As stated in the preceding section of this report, the record indicates that there is a triable issue on secondary meaning. Rubbermaid's contention as to the significance of Eldon's supplemental registration does not bar Eldon from proceeding on its unfair competition claim.

## CONCLUSION

The court recommends that defendants' Motion for Partial Summary Judgment be (1) GRANTED with respect to the cancellation claims of Rubbermaid Commercial's counterclaim; (2) GRANTED with respect to Counts I and II of Eldon's Complaint; and (3) DENIED with respect to Counts III and IV of Eldon's Complaint.

Counsel are given ten days from the date hereof to file exceptions to this Report and Recommendation with the Honorable Ilana Diamond Rovner. Failure to object constitutes a waiver of the right to appeal.

Respectfully submitted,

(s) Joan B. Gottschall
JOAN B. GOTTSCHALL
United States Magistrate

DATED: September 19, 1989.